```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF GEORGIA
 2                        ATHENS DIVISION

 3   UNITED STATES OF AMERICA,        :
                                      :
 4             Plaintiff              :
                                      :
 5        vs.                         :  CIVIL ACTION
                                      :  NO. 3:13-CV-62(CDL)
 6   $500,000.00 IN U.S. FUNDS,       :
                                      :
 7             Defendant              :
     ---------------------------------
 8   MACON, GEORGIA        1:02 P. M.        AUGUST 15, 2013

 9             The deposition of ANDREW CLYDE is being taken

10   by the Plaintiff; testimony is being given before

11   Frances Y. Grice, Georgia Certified Court Reporter

12   B-2383, in the offices of the United States Attorney,

13   300 Mulberry Street, Suite 400, Macon, Georgia, on

14   August 15, 2013, beginning at approximately 1:02 p. m.

15   -----------------------------------------------------------

16   APPEARANCES:

17   For the Plaintiff:       MR. DANIAL E. BENNETT
                              MR. G. F. "PETE" PETERMAN, III
18                            United States Attorney's Office
                              Post Office Box 1702
19                            Macon, Georgia  31202

20   For the Claimants        MR. MICHAEL C. DANIEL
     Andrew Clyde and         Prior, Daniel & Wiltshire
21   Clyde Armory, Inc.:      400 North Milledge Avenue
                              Athens, Georgia  30601
22
     Also present:  Kristi Cote
23

24

25
```

```
 1   STIPULATIONS:

 2          MR. BENNETT:     This will be deposition of

 3   ANDREW CLYDE taken pursuant to agreement of

 4   counsel.   Michael, the usual agreements on

 5   objections?

 6          MR. DANIEL:     Yes.

 7          MR. BENNETT:     Very good.

 8          MR. DANIEL:     And we'll read and sign.

 9   We'll expedite the reading and signing so you

10   can get it probably within 48 hours after we

11   get the transcript, if that's agreeable with

12   you all.

13          MR. BENNETT:     Yeah, absolutely.

14          (REPORTER'S NOTE:     The witness RESERVES

15   the right to read and sign the completed

16   transcript of the deposition.)

17

18

19

20

21

22

23

24

25
```

**L A W Y E R ' S   N O T E S**

| Page | Line | |
|------|------|---|
| | | |

PENGAD, INC. • 800-631-6989 • www.pengad.com

1                    ANDREW CLYDE

2           having first been duly sworn by the

3           court reporter, testified on

4                 CROSS-EXAMINATION

5    BY MR. BENNETT:

6        Q    Mr. Clyde, this is your deposition.  You sat in

7    on depositions this morning.  The same process, I'll ask

8    you questions.  If you don't understand my question, I

9    promise you you will not be the first one to tell me

10   that you didn't understand what I just asked.  So do not

11   hesitate to have me repeat it.  If you need to take a

12   break at any time, let me know, and I'll be sure we can

13   take a break, and if anything else comes up, just let me

14   know and we'll go from there.  I'm going to try to ask

15   questions in an intelligent and rapid way, so we can get

16   through this.

17            Sir, regarding your background, when did you

18   -- where did you go for undergraduate?

19       A    Bethel College.

20       Q    Where is Bethel College?

21       A    Mishawaka, Indiana.

22       Q    Could you spell that for the court reporter?

23       A    M-i-s-h-a-w-a-k-a, Mishawaka, Indiana, and also

24   the University of Notre Dame.  I attended both schools

25   at the same time.

1       Q     Which -- which of the two conferred your

2   degree?

3       A     Bethel College.

4       Q     Bethel College.   Did you go to Notre Dame as

5   you took some courses there?

6       A     ROTC.

7       Q     Okay, so I understand that.   So --

8       A     In naval science.

9       Q     And so you went through Bethel College and the

10  University of Notre Dame on a -- is it a Navy ROTC

11  scholarship?

12      A     Yes, I did.

13      Q     And when were you commissioned?

14      A     May the 18th of 1985.

15      Q     You were commissioned as a regular ensign, I

16  take it?

17      A     As an ensign, that's correct.

18      Q     All right.   What was your undergraduate degree

19  in?

20      A     Business administration.

21      Q     I know it's been at least a few years since

22  then, but can you give me a general sense of what a

23  business administration degree at Bethel -- is Bethel

24  College involved -- what some of your coursework was

25  generally?

1    A    Oh, my lord.

2    Q    If you can recall?

3    A    General business, I mean.

4    Q    Fair enough.  It's been a number of years.

5    A    It's been almost 30 years.

6    Q    Yes, sir.  So a business administration degree.

7    You went into the Navy.  What did -- what was your

8    designation in the Navy?

9    A    I went into the Navy as a -- initially, as a

10   Naval flight officer.

11   Q    Okay.

12   A    Okay, and -- and then transitioned from there

13   to a Naval aviation supply officer and went to Athens,

14   Georgia, to the Naval Supply Course school.

15   Q    How long was the Naval Supply -- Supply school

16   when you went through the first time in Athens?

17   A    It was six months, six months only.

18   Q    Same question, could you give me a sense of the

19   general topics that were taught there, what you learned

20   in a general sense?

21   A    Pretty much the four areas of the Navy Supply

22   Corps.  One is ship's store, which is -- I was the

23   ship's store officer.  One was -- golly, S8 -- S8

24   Division.

25   Q    Storekeeping?

1       A       Storekeeping, thank you.  Yeah, storekeeping.

2  Food service, which I did not like, and we did payroll

3  or disbursement, and then, after I graduated from that,

4  I went into aviation logistics, and we did aviation.

5       Q       How many years of active duty did you serve?

6       A       Eleven.

7       Q       And during that time, I take it, you served in

8  a combat role on ships at seas?

9       A       I served on -- my first tour was two years with

10  a fighter squadron as a material control officer.  After

11  that was a -- two years on board aircraft carrier Midway

12  as a S6 aviation repairables officer and as a ship

13  store/laundry officer, and then I went to Naval Air

14  Station Jacksonville, and I was the S6 and S8 division

15  officer there for about a year for each.  That was with

16  aviation repairables and aviation supply.  From there I

17  went to the USS Saratoga in Mayport, Florida, and I was

18  the S6 division officer of aviation supply on board the

19  -- on board the Saratoga until she was decommissioned in

20  '94, and then I went from there to Athens, Georgia, to

21  teach aviational logistics at the JASMMM Aviation Supply

22  Maintenance Material Management School, and I taught

23  there until I left active duty in March of 1996.

24       Q       When you were assigned to Athens as -- I take

25  it, you were an instructor at the supply school?

1     A     Yes, I was.

2     Q     And I -- is that when you took the opportunity

3  to get your MBA?

4     A     No, no.  I left active duty in 1996, and I went

5  and worked for a friend of mine for a year in private

6  industry, and then, in 1997, then I went to the

7  University of Georgia to get my MBA.

8     Q     And it's correct you hold an MBA from the Terry

9  School of Business?

10     A     That is correct.

11     Q     And what year did you obtain that?

12     A     1999.

13     Q     Did you have a focus with your MBA?

14     A     I did.

15     Q     Can you tell us -- tell me a little bit about

16  it.

17     A     Sure.  It was corporate finance and

18  entrepreneurship.  Those were my two focuses.

19     Q     Could you describe in general terms some of the

20  coursework that's involved in obtaining an MBA from the

21  Terry School of Business?

22     A     Oh, I think we did -- Professor Hofer was my

23  entrepreneurship professor.  We did a lot of business

24  plans, really big pie-in-the-sky kind of stuff.  We did

25  -- we had business plan competitions and how to build a

1    business and write a business plan for it.  I think we

2    did some marketing classes.  I had some advertising

3    classes.  I know I had some international -- some

4    classes on international business because I was

5    interested in that.  I had a managerial accounting

6    course.  I had a basic -- basic accounting course.  I

7    had, I think, a real estate course that I took.  We had

8    a negotiations course, which I really enjoyed.  I think

9    that was called Getting to Yes, and -- and then a couple

10   of -- and then some finance courses, and I enjoyed the

11   finance courses.

12        Q    Did any of your finance or accounting courses

13   include topics such as banking regulations or business

14   law, things of that kind?

15        A    Banking regulations, no, none.  Business law, I

16   think I did take a course on business law, and I believe

17   I still have the textbooks.

18        Q    Now, fast forwarding to present, you're the --

19   it's -- you're the president of Clyde Armory, Inc.; is

20   that correct?

21        A    I'm the CEO.

22        Q    CEO?

23        A    That's the term I use.

24        Q    This is a company, is it fair to say, you've

25   built from the ground up and it's yours?

1    A    Yes, I've built from the ground up and it's

2    mine.

3    Q    Is it also fair to say it's a multimillion

4    dollar business at this point?

5    A    Probably.  I would guess.  I mean, if you want

6    to look at assets, it's probably got a couple million,

7    so I guess that's multimillion.

8    Q    It is my impression -- and please correct me if

9    I'm wrong -- that you are an active owner of this

10   business?  By that, I mean you're onsite and work hard

11   in Athens on this -- on this business --

12   A    I do.

13   Q    -- is that right?

14   A    Correct.  That is correct, yes.

15   Q    You're not, for example, someone who owns this

16   business and then lives down in Florida?

17   A    I'm not an absentee owner.

18   Q    In addition, at some point, could you describe

19   your involvement with a local credit union, Clark -- is

20   it Clark Community Federal Credit Union?

21   A    Clark Community Federal Credit Union.

22   Q    What did you -- what did you -- first of all,

23   when did you become involved with Clark Community

24   Federal Credit Union?

25   A    Oh.

1   Q  An approximate date is fine.

2   A  It would be in the late nineties, sometime in

3 the late nineties.  Probably while I was still in school

4 would be my guess.

5   Q  Talk to me a little bit about what Clark

6 Community Federal Credit Union was.  Describe it a

7 little bit.

8   A  It was just a local credit union.  I mean I had

9 banked with Naval Federal Credit Union on a personal

10 side for a long time.

11   Q  Yes, sir.

12   A  And -- and you know, I'm a pretty frugal guy,

13 so I tend to look for what I think are the best deals,

14 and I thought credit unions are -- are -- tend to give a

15 person a little better deal than a bank does.

16   Q  Yes, sir.  How did you -- now, what -- were you

17 just a customer of that institution?

18   A  I was a customer.  I was a customer of Clark

19 Community Federal Credit Union.  That's correct.

20   Q  Now, did you -- did you at some point take on a

21 leadership role with the credit union?

22   A  I was voted into -- I attended one of their

23 meetings, a membership meeting, and -- and they voted me

24 onto the board.

25   Q  Is it correct that you served as a board of

1    direct -- on the board of directors of Clark Community

2    Credit Union during the years of 2008 to 2009?

3         A    That's probably correct.   I mean it was -- it

4    was a short period of time.

5         Q    And is it right -- that I was right before, I

6    believe, Clark Community Credit Union became part of --

7    was it Gwinnett Federal Credit Union?

8         A    Yes.

9         Q    So you served for one year on the board of

10   directors of a community federal credit union?

11        A    Uh-huh.

12        Q    You have to say -- unfortunately, you have to

13   say yes.

14        A    Yes, yes, yes.

15        Q    Very good.   Now, I want to turn to the -- oh, I

16   neglected to ask you this:   When you were a Naval

17   officer, at the high -- at any given point, how many

18   people -- what's the most people you had working for you

19   at any given time as either a division officer or a --

20   if you can estimate?   I know that's probably a hard

21   question, but I'm just trying to get a sense of how many

22   people.

23        A    Probably on an aircraft carrier, probably 50 or

24   60.

25        Q    Now, with -- I mean, as we're here today for

```
 1    your -- for your armory and your business, how many --
 2    how many employees -- full-time employees do you have?
 3         A    Full-time?  I'd have to go back and look.  I
 4    can give you an approximate.
 5         Q    Yes, sir.
 6         A    Fifteen.
 7         Q    Fair enough.
 8         A    With a number of part-time.
 9         Q    Yes, sir.  Let's turn to -- I'm going to turn
10    to the pretrial order that was prepared for this case,
11    and specifically, I'm going turn to the witnesses that
12    have been -- a bunch of witnesses that have been
13    identified, and for all 16 of these individuals, I'm
14    going to ask you, unfortunately in a repetitive way, who
15    they are --
16         A    Uh-huh.
17         Q    -- and what you expect them to testify about
18    and then a couple of other follow-on questions, and
19    we'll just follow that pattern as we go through as I --
20    as I want to know a little bit about who these people
21    are.
22         A    Uh-huh.
23         Q    First, Ralph Hudgens, who is Ralph Hudgens?
24         A    Are you serious?
25         Q    I am serious.  Who is Ralph Hudgens?
```

1        A      Okay.   Ralph Hudgens is the Fire and Insurance

2    Commissioner of the State of Georgia.

3        Q      Okay.   Is that what the -- the position he

4    currently holds?

5        A      Yes.   He's on the Governor's cabinet.

6        Q      What -- what do you expect Mr. Hudgens to

7    testify about at trial?   What's his expected testimony

8    to be?

9        A      Character reference.

10       Q      How long have you known Mr. Hudgens?

11   Approximate -- an approximate answer is perfectly fine

12   for my purposes.

13       A      Fifteen years.

14       Q      Have you been in business with Mr. Hudgens?

15   Has he had any involvement in your business Clyde

16   Armory?

17       A      No.

18       Q      Is it fair to say he's not been involved in the

19   day-to-day banking activity of -- of Clyde Armory?

20       A      That's correct.

21       Q      So his knowledge of this case would be limited

22   to being a character reference; is that right?

23       A      That's correct.   I think that's what I said.

24       Q      Yes, sir.   Let's move on to Scott Berry.   Who

25   is Scott Berry?

1    A    Scott Berry is the Sheriff of Oconee County.

2    Q    What do you expect mister -- or excuse me,

3 Sheriff Berry to testify about?

4    A    Character witness.

5    Q    How long have you know Sheriff Berry,

6 approximately again?

7    A    Twelve years.

8    Q    Same question, is Sheriff Berry involved in the

9 day-to-day banking activity of Clyde Armory?

10   A    No.

11   Q    And does he have knowledge of the conduct

12 giving rise to forfeiture in this case?  In other words,

13 does he know about or is he involved in the banking

14 activity of Clyde Armory?

15   A    He is not involved in the banking activity of

16 Clyde Armory, but he does know about this case.

17   Q    Yes, sir.  Who is Ann Coles?

18   A    Ann Coles is -- I'm not sure of her exact

19 title, but she works with the Wren Group.

20       MR. PETERMAN:    Can you spell that?

21       THE WITNESS:        A    W-r-e-n,

22 whiskey-Romeo-echo-November.

23       MR. BENNETT:        Q    It's the phonetic

24 alphabet.  That made me smile.  I apologize.  Wren?

25   A    Yes, sir.

1     Q     The Wren Group.   What does -- what does the
2   Wren Group do?
3     A     The Wren Group, they're the people who set up
4   our point-of-sale system and our Enterprise system.
5   She's the lady that helped us decide what system to use,
6   and she was instrumental in its implementation.
7     Q     Your answer to that probably tells me what I
8   need to know, but nevertheless, what do you expect her
9   to testify about?   The point-of-sale system?
10     A     The point-of-sale system, yes.
11     Q     Okay.   And --
12     A     And Enterprise, yeah, and the financial system
13   as well.
14     Q     And she is not involved, I take it, in the
15   day-to-day banking activities of Clyde Armory?
16     A     No.
17     Q     And she would also have no knowledge of the
18   cash deposits that gave rise to this forfeiture?
19     A     No.
20     Q     Let's move on to Greg Garcia.   Who is Greg
21   Garcia?
22     A     Greg Garcia is an attorney, a tax attorney.
23     Q     What do you expect Mr. Garcia to testify about?
24     A     I requested Mr. Garcia to do an audit of my
25   taxes, and I expect that he would testify that all

1  income has been reported and all taxes -- appropriate

2  taxes paid.

3      Q    When did you ask him to prepare an audit of

4  your taxes?

5      A    I don't know.  I think it was two months ago,

6  three months ago.

7          MR. DANIEL:     I don't know the exact

8      date.

9          THE WITNESS:    Okay.

10         THE WITNESS:    A    I don't remember the --

11  it was within the last -- after the 18th of April.

12         MR. BENNETT:    Q    Yes, sir.  Okay.  And --

13     A    Is that fair enough?

14     Q    That is fair enough.  And has he prepared a

15  report that describes his findings?

16         MR. DANIEL:     No.

17         THE WITNESS:    A    I have not seen one, so

18  I don't know the answer to that yet.

19         MR. BENNETT:    Q    Is it anticipated that

20  he will prepare a report that will be something he will

21  rely on at trial to testify, if you know?

22     A    He works for him.  So I would expect that would

23  be the case.

24         MR. BENNETT:    We can go off the record

25     just for a moment.

```
 1              (OFF THE RECORD)
 2          MR. BENNETT:    We'll go back on the
 3      record.
 4          MR. BENNETT:    Q    Mr. Clyde, who is Brett
 5  Jamison?
 6      A    Brett Jamison is my CIO and director of law
 7  enforcement sales.
 8      Q    By --
 9      A    Chief information officer.
10      Q    Yes, sir.  And what do you expect Mr. Jamison
11  to testify about?
12      A    Just about the -- the general business itself
13  and its -- the way we conduct business.
14      Q    Does -- is Mr. Jamison someone who is involved
15  in the day-to-day banking activities as it relates to
16  Robins Federal Credit Union?
17      A    No, not prior to April the 12th, not -- not
18  truly.  He would be involved in the -- because he's the
19  chief information officer --
20      Q    Yes, sir.
21      A    -- he was very much involved in the bringing of
22  the system of point-of-sale and Enterprise into place.
23  Okay?  Does that make sense?
24      Q    It does, yes, sir.  So any of the -- you're
25  aware of the Government's allegation that 109 cash
```

1    transactions are -- were structured?  You're aware of

2    that allegation?

3        A    I am aware of that allegation.

4        Q    Is Mr. Jamison someone who would've conducted

5    any one of those cash deposits?

6        A    No.

7        Q    Okay, fair enough.  And so that answers my

8    question that he is not knowledgeable about the cash

9    deposits that are at issue in this case?

10       A    I would agree with that.

11       Q    Let's move on to Joni McCauley.  Tell me who

12   Joni McCauley is?

13       A    Joni McCauley is the lady who replaced Leslie

14   Nichols.  She is my financial assistant, and her

15   responsibilities are bookkeeping and insurance and

16   general administrative assistant.

17       Q    Do you recall when she came on board at Clyde

18   Armory, using the term on board loosely?

19       A    I understand.  End of January.  I don't

20   remember the exact date, but it would've been around the

21   29th, 30th, 31st, somewhere in there, 28th maybe.  I

22   would have to go back and look for the exact date, but

23   -- but that's --

24       Q    We can come back to Ms. McCauley later, but is

25   it fair to say that Ms. McCauley also made deposits that

```
 1    have been identified by the Government as subject -- or

 2    that were structured deposits?

 3              MR. DANIEL:    I object to form.

 4              MR. BENNETT:    Let me do that again.

 5              MR. BENNETT:    Q    It's my understanding

 6    that Ms. McCauley took over for Ms. Nichols, correct?

 7         A    That's correct.

 8         Q    Was -- among Ms. McCauley's responsibilities,

 9    was one of them to make cash deposits on your behalf at

10    Robins Federal Credit Union?

11         A    Yes, that is correct.

12         Q    So is it fair to say, beginning on -- on or

13    about February 1st of 2013, the deposits that were made

14    in the Robins Federal Credit Union were made no longer

15    by Leslie Nichols, but were made by Joni McCauley?

16         A    That is correct.

17         Q    All right.   We're going to come back to Joni

18    McCauley later, but that's --

19              MR. DANIEL:    Is it Joanie or Joni?

20              THE WITNESS:    A    It's Joni.

21              MR. BENNETT:    Q    Joni, I'm sorry.

22         A    That's okay.

23         Q    Is it spelled J-o-n-i?

24         A    It is, but it's pronounced Joni.

25         Q    That's tricky.
```

```
 1        A     She will wear you out.

 2        Q     Leslie Nichols, I need not ask about because I

 3   know who Leslie Nichols is, and I understand her role in

 4   this case.   Eddie Patat, tell me about -- who is he?

 5        A     You met Eddie on our meeting on the 18th.

 6        Q     I did.

 7        A     He is my CPA.

 8        Q     What do you expect him to testify about at

 9   trial?

10        A     I would expect that Eddie would testify to the

11   fact that he does my taxes and that my taxes are

12   appropriately done and that -- that all income has been

13   appropriately recorded and appropriate taxes paid, I

14   would expect.

15        Q     Now, would Mr. Patat -- was he involved or is

16   he -- was he involved in the day-to-day banking activity

17   that related to the structured accounts?

18        A     No.

19        Q     I believe it's correct that he didn't know

20   about this; is that right?

21        A     He did not know about this.

22        Q     You didn't seek his advice on whether this was

23   an appropriate course of action?

24            MR. PETERMAN:     You're referring to

25        deposits --
```

1          MR. BENNETT:     Yes.

2          MR. PETERMAN:     -- that were made?

3          MR. BENNETT:     Yes, I should ask -- let

4     me ask that again.

5          THE WITNESS:     A     Sure, please.

6          MR. BENNETT:     Q     I'm sorry, I warned you

7     at the front end.  Was Mr. Patat aware of -- of the 109

8     deposits that are the subject matter of this case?

9          A     No, I would say not.

10         Q     All right.  Who's Trisha Parker?

11         A     Trisha Parker is -- would be a character

12    witness.  She is the director of the Athens Pregnancy

13    Center.

14         Q     Just for protocol here, Ms. Parker, I take it,

15    is not involved in the day-to-day banking activity of

16    Clyde Armory?

17         A     That is correct.

18         Q     And she would not be knowledgeable about the

19    conduct giving rise to this case?

20         A     That's correct.

21         Q     Let's move on to Mr. Bill Rickets.  Who's Bill

22    Rickets?

23         A     Bill Rickets is my pastor.

24         Q     I take it he would be a character reference for

25    you?

1      A     He would be a character reference.  That's

2   correct.

3      Q     And I don't want to assume something, but I'm

4   going to assume that he's not -- would not have been

5   involved or known about the day-to-day banking

6   activities of the business?

7      A     That is correct.

8      Q     And nor would he be knowledgeable of the

9   conduct giving rise to forfeiture?

10     A     That is correct.

11     Q     Let's talk about Tracy Thompson.  Who is that?

12     A     Tracy Thompson is the director of the Mercy

13   Health Center in Athens.  She would also be a character

14   reference.

15     Q     What -- what would she tell us about you?

16     A     She would probably tell us of what Clyde Armory

17   has done for the community through her ministry.

18     Q     Same questions, she's -- I take it Ms.

19   Thompson's not involved in the day-to-day business --

20   banking activity of Clyde Armory?

21     A     She is not.

22     Q     And that she would not be knowledge of the

23   conduct giving rise to forfeiture?

24     A     She would not.

25     Q     Jeff Ingram, who is that?

1      A      Jeff Ingram, he's the chief investigator of --

2    I think it's the Magistrate Court.

3      Q      Of?

4      A      Athens-Clark County.   I think it's the

5    Magistrate Court.   I'm not positive.

6      Q      Yes, sir.   And --

7      A      Character reference.

8      Q      Character reference.   As compared to the other

9    character references, what would Mr. Ingram's testimony

10   be expected?   What would I expect?

11     A      You would expect that he would say that he's

12   known me for a dozen years and attest to my character

13   and to my integrity.

14     Q      Sir, who is Jerry Haas?

15     A      He's also a pastor at Prince Avenue Baptist

16   Church.   He's also a character reference.

17     Q      I'm going to take these together, and then I'll

18   come back with a question.   Jeff Burkart?

19     A      Jeff Burkart is the CEO of Guardian Centers.

20   That is a training facility in Perry, Georgia, and we

21   have a business relationship.

22     Q      Is he also a character reference?

23     A      Yes, he is.

24     Q      Who was Ryan Lebowitz?

25     A      Ryan Lebowitz is my personal banker at Wells

1   Fargo.

2       Q       Before I come to him, for Mr. Ingram, Mr. Haas,

3   Mr. Burkart --

4       A       Correct.

5       Q       -- all three, the same question as to

6   everybody, they were not involved in the day-to-day

7   banking activity; is that correct?

8       A       That is correct.

9       Q       And they would not be knowledgeable of the cash

10  deposits giving rise to forfeiture?

11      A       That is correct.

12      Q       So Mr. Lebowitz, what -- would he be a

13  character -- would he be a character reference?

14      A       No, I don't believe -- I mean, I guess he could

15  be.  I've only known him --

16      Q       Professionally?

17      A       -- professionally, yeah.

18      Q       Tell me what to expect from his testimony.

19      A       He would just be someone who would have

20  knowledge of our banking at Wells Fargo.

21      Q       The 109 cash deposits that are the subject

22  matter of this case, has that conduct occurred with

23  Wells Fargo or is it isolated only to Robins Federal

24  Credit Union?

25              MR. DANIEL:       Repeat that question.

1          MR. BENNETT:        Q      The conduct giving rise

2    to -- or the 109 transactions that are at issue in this

3    case, that kind of cash deposits, is that limited only

4    to Robins Federal Credit Union or has that occurred at

5    Wells Fargo as well?

6          MR. DANIEL:      Object to the form.   You

7       can answer it, if you understand it.

8          THE WITNESS:       A      Okay.

9          MR. BENNETT:        Q      I can say it in less

10   words.   Did you structure -- did you or someone on your

11   behalf structure cash in Wells Fargo as well as Robins

12   Federal Credit Union?

13         MR. DANIEL:      Object to the form.

14         MR. BENNETT:      Yes, sir.

15         THE WITNESS:       A      I don't believe that we

16   structured cash period.

17         MR. BENNETT:        Q      I understand.   With that

18   understanding?

19     A      We normally -- we deposit a little bit into

20   Wells Fargo simply because they have limits on what you

21   can deposit, you know.

22     Q      Right.

23     A      And if you go over those limits, then they

24   charge you money to deposit cash, which just grates me.

25     Q      Yes, sir.

1        A      Okay, so --

2        Q      I seem to recall or know from somewhere that

3  it's Wells Fargo that holds the note on your property?

4        A      It is.   Wells Fargo holds the note on the

5  property.

6        Q      And that most of the Internet sales or the

7  automated transactions -- forgive me for not getting

8  this right, but essentially, if it's automated, it -- it

9  goes with Wells Fargo; is that a gross generalization?

10 Is that correct?

11       A      All the credit card sales go into Wells Fargo.

12 We have our operating account at Wells Fargo because

13 they hold the note on the facility.

14       Q      Yes, sir.

15       A      Okay, and therefore, part of the stipulation

16 for holding the note or giving a note really is that

17 they hold our operating account because they want to see

18 cash flow through the business, and so -- and so I have

19 a -- an operating account and I have a note and I have a

20 line of credit.

21       Q      Yes, sir.   Who's --

22       A      And I --

23       Q      Go ahead, I didn't mean to interrupt you.

24 Please finish.

25       A      I'm finished.

1    Q    Who is Mark Moore?

2    A    Mark Moore is the Sheriff of Wilkes County.

3    Q    What would I expect from his testimony?

4    A    Character reference.

5    Q    How long have you known him approximately?

6    A    Fourteen years.

7    Q    I take it he's not involved in the day-to-day

8    banking activity of Clyde Armory?

9    A    He is not.

10    Q    And he's not knowledgeable of the cash deposits

11    giving rise to this case?

12    A    He is not.

13    Q    All right.  Let's move on to the exhibits that

14    have been listed.  I only have -- I think some of them

15    are self-explanatory, so I won't ask you about all of

16    them, but I do need to ask you about a few.  Let's start

17    with --

18        MR. DANIEL:    Dan, I notice in looking at

19    that list that we have left off one of the

20    exhibits.  It was presented at the hearing.

21    It's the appraisal.

22        MR. BENNETT:    Yes, sir.

23        MR. DANIEL:    And we'll -- we'll produce

24    that to you.

25        MR. BENNETT:    So that would be likely

1    C-12?

2            MR. DANIEL:      C-12.

3            MR. BENNETT:     Fair enough, and we don't

4    object to C-12's genesis.

5            MR. BENNETT:     Q      C-6 -- C-6 is a notice

6    of law.   Is it fair to say a notice of law was not

7    provided to you by the agency?

8       A     That is correct.

9       Q     It is your position and belief that a notice of

10   law should've been issued to you?

11      A     Yes, it is.

12      Q     Why is that?

13      A     Because I had no knowledge of the law.   I don't

14   see how you can accuse somebody and convict somebody of

15   something that they didn't know was wrong.   I mean

16   that's just wrong, and -- and obviously, the

17   Government -- at least to me, it's obvious.   The

18   Government recognizes that and provides a form that

19   documents that recognition, and yet the Government in

20   this case has chosen not to use it.   I don't understand

21   that.

22      Q     Fair enough.   Let's go to C-8.   C-8 is a letter

23   that was provided -- it's here somewhere.   I'll just

24   give you a copy so you can see what I'm talking about.

25   I'm not going to make this an exhibit -- a copy to the

1    -- attach the exhibit.  Mr. Clyde, do you -- I'll give

2    you a second to look this over.  Do you recognize this

3    document?

4        A    I do.

5        Q    Tell me about it.  What is this?

6        A    Let me -- let me --

7        Q    Yes, sir.

8        A    -- make sure it's the correct document.

9        Q    Yes, sir.

10           MR. BENNETT:    So the record is clear,

11       what I'm referring to is listed as Claimant's

12       Exhibit 8.  It's a letter dated June 13th,

13       2013, to Mr. Clyde from a gentleman whose name

14       I have no chance of pronouncing correctly.  It

15       is spelled C -- as in Charlie --

16       h-i-a-f-u-l-l-o, who is with the National

17       Coordinating Counsel of the FFL Guard.

18           THE WITNESS:    A    Uh-huh.

19           MR. DANIEL:    You have to speak vocally.

20           THE WITNESS:    A    Yes.

21           MR. BENNETT:    Q    How did you -- how did

22       you come into possession of this letter?

23       A    I asked for it.

24       Q    What precisely is the significance of this

25   document to you?  Just explain it to me.  What -- what

1    is it?

2        A    This document, I believe I have a fairly good

3    understanding of firearms law.

4        Q    Yes, sir.

5        A    Okay, it my business; it's what I work in every

6    day.  I try and make sure that -- that I understand

7    Federal firearms law, and this individual is my

8    attorney, and his business is called FFL Guard.  He's

9    the National Coordinating Counsel for 400 Federal

10   firearms licensees, and we all use him as our attorney,

11   and my intent with this is to show that -- you talk

12   about structuring as being something illegal.  Okay?  In

13   the firearms industry, as is proof of this letter --

14   okay, this is a legal opinion -- structuring in a

15   multiple sale, okay, is not illegal.

16       Q    Okay.

17       A    So I'm like, okay, you know, if a person -- if

18   a person says I want to buy three handguns, okay?

19       Q    Yes, sir.

20       A    Now, if they buy three handguns within a

21   five-day period, by law I have to fill out a multiple

22   sale form for them and send it into the ATF.

23   Absolutely, that's the requirement.  Now, if they want

24   to buy a firearm every Monday so they avoid that, it's

25   not illegal.

```
 1        Q    Is it fair to say you're trying to analogize
 2   the -- what's being discussed here in ATF regulations to
 3   -- because the word structuring is used in this context,
 4   to the subject matter in this case, which is structuring
 5   under the Bank Secrecy Act; is that right?
 6        A    That's correct.  I -- I -- I think that's --
 7   that's a fair way to put it, that -- that my foundation
 8   for understanding structuring in the banking industry
 9   would be this.
10        Q    Okay.
11        A    And -- and -- okay.
12        Q    My purpose here today is not to -- is simply to
13   understand, not to argue with you.
14        A    Okay.
15        Q    I just needed to understand -- hear from you
16   what this had to do with it.  Okay.  Next is Exhibits
17   C-9, C-10, and C-11.  They -- they are listed as receipt
18   for purchase of firearm for Ms. Nichols --
19        A    Uh-huh.
20        Q    -- a Clyde Armory receipt for concealed/carry
21   weapon permit for Ms. Nichols, and a Sheriff's receipt
22   for the concealed/carry weapon permit for Ms. Nichols.
23        A    Uh-huh.
24        Q    What is the purpose of these documents at
25   trial?
```

1      A     Part of my limiting of her carrying of cash is

2   concern for her safety as is evidenced by these

3   documents.  I think that -- you know, I'm not going to

4   -- I'm not going to tell everybody every possible

5   negative thing that can happen to you when you carry

6   cash for me, okay, but I'm going to do what I can to

7   protect her, all right, from what could potentially

8   happen to her and happen to me, too, you know, because

9   cash, when it leaves my building, is perishable.  It --

10  if something happens to it, you're not going to get it

11  back.  I mean it's irreplaceable.  I guess that's the

12  better word than perishable.  It's irreplaceable.  So it

13  -- it was my intent to encourage -- and I'm not going to

14  demand that anyone carry a gun.  I don't think that's

15  appropriate, but it was my intent to encourage her to

16  carry her pistol when she carried cash, and this is one

17  of the ways I did that.

18      Q     And I need to follow up on something you just

19  said.  You mentioned limiting the amount of currency.

20      A     Correct.

21      Q     What -- what does that mean?

22      A     What does that mean?  That means limiting the

23  currency that she carries.

24      Q     How much did you limit it to?

25      A     $10,000.

1          Q     And you expressly told her not to carry more

2     than $10,000 to the bank?

3          A     I expressly told her not to deposit more than

4     $10,000.

5          Q     And your reason for doing that was concern for

6     safety with her transporting cash to the bank?

7          A     Well, there are multiple reasons.

8          Q     That was one reason?

9          A     That was one reason.   That's correct.

10         Q     And just to be clear, you are telling us that

11    you limited Ms. Nichols to depositing less than $10,000;

12    that was your direction?

13         A     Yes.   I -- I limited Ms. Nichols' depositing.

14    That's correct.

15         Q     And why did --

16         A     That has been my policy from day one.   I -- I

17    just have never deposited more than $10,000 until April

18    the 12th.

19         Q     Mr. Clyde, that begs the question why $10,000

20    and not some other number?

21              MR. DANIEL:      Object to form.

22         Argumentative, asked and answered.   If you

23         understand the question, you can answer it.

24              MR. BENNETT:      I'll ask it -- I'll strike

25         and I'll ask it again.

1          MR. BENNETT:     Q     Why did you select

2     $10,000?

3          A     A couple of reasons.  I think that's probably

4     what I could bear to lose, number one.  Don't want to.

5     I mean I could've selected a smaller number, but also I

6     had heard within the industry that -- that, if you

7     deposit over $10,000, that you'll get an IRS audit.

8          Q     Why would you get an IRS audit?

9          A     I don't know the exact -- I don't know why you

10     would.  Okay?  I don't -- I've never worked for the IRS.

11     I don't know their determination.

12          MR. PETERMAN:     What was your

13     understanding of how the IRS would know that

14     you had deposited $10,000 or more?

15          THE WITNESS:     A     I didn't have one.  An

16     understanding of how the IRS would know?  I mean, say

17     that again?

18          MR. PETERMAN:     How would you -- you said

19     you deposited ten thousand -- less than $10,000

20     because --

21          THE WITNESS:     Uh-huh.

22          MR. PETERMAN:     -- you understood that

23     the IRS might audit you if you deposited more

24     than that.  How would the IRS know that you

25     were depositing more $10,000?  What was your

1     understanding of how they would be aware of the

2     fact that you were depositing more than that?

3          THE WITNESS:      A      Okay.  Well, I believe

4     it's common knowledge that -- that a bank -- that

5     anytime you were -- that you deposit more than $10,000,

6     a bank sends a report to the IRS and that reports give

7     you -- you know, increases your opportunity for an

8     audit.

9          MR. PETERMAN:      And you knew that

10         throughout the time that you were making --

11         MR. DANIEL:      I object to --

12         MR. PETERMAN:      You're correct.  Go

13     ahead.

14         THE WITNESS:      A      Okay.  And it is my

15    intent and always has been my intent for -- to do

16    everything within the law to avoid an IRS audit.  I've

17    never had an IRS audit.  I've heard horror stories of

18    IRS audits, and I simply want to be treated fairly, and

19    -- and I would not do -- I would not knowingly do

20    anything illegal to prevent an IRS audit.

21         MR. BENNETT:      Q      But it is fair to say

22    that the reason that you deposited less than $10,000,

23    the purpose of doing that, in part, was to avoid or

24    evade an IRS audit happening to you or to your business?

25         A     Not -- not to evade.

1    Q    To avoid?

2    A    To lessen the chance.

3    Q    Yes, sir.

4    A    Okay.

5    Q    Yes, sir.

6    A    To lessen the probability.

7    Q    All right.

8    A    And -- and whether -- and whether that report

9  -- and how it got to the IRS, I don't really know.

10   Q    Yes, sir.

11   A    Or I didn't know before -- let's put it that

12  way, I didn't know before April the 12th.

13   Q    But before we leave this topic, is it fair to

14  say the $10,000 threshold was not an arbitrary number;

15  it's a number that, in the industry, was generally known

16  to be the number you didn't want to cross if you wanted

17  to evade an IRS -- or if you wanted to avoid an IRS

18  audit?

19   A    If you wanted to -- to not have an IRS audit,

20  that would be the number.

21   Q    Fair enough.

22        MR. PETERMAN:    Because that will prevent

23     the report from being sent the IRS, correct?

24        THE WITNESS:    A    I don't know.  From what

25  I have learned since, it doesn't matter the number.

1      MR. PETERMAN:     But your purpose was to

2   prevent that report from being sent to avoid

3   the audit, correct?

4      THE WITNESS:     A     My purpose was to lessen

5   -- lessen --

6      MR. PETERMAN:     Just give me a yes or no,

7   and then you can explain it any way you wish.

8      THE WITNESS:     A     All right, say that

9   again.

10      MR. PETERMAN:     Your purpose of filing --

11   depositing less than $10,000 was to avoid the

12   report going to the IRS because you feared the

13   report would make you more likely to get an IRS

14   audit.

15      THE WITNESS:     A     Yes.

16      MR. PETERMAN:     Now, you can explain that

17   in any way you wish, Mr. Clyde.

18      THE WITNESS:     A     But that was only part

19   of the reason.

20      MR. BENNETT:     Q     But it was a part of the

21   reason?

22      A     It was a part of the reason.

23      Q     Yes, sir.

24      MR. PETERMAN:     And that was throughout

25   the time these deposits, 109, were being made?

1        THE WITNESS:     A     It's been my policy

2   since day one.

3        MR. BENNETT:      Q     Mr. Clyde, let's talk a

4   little bit about your interview with the agents.

5        A     Uh-huh.

6        Q     Do you -- I imagine you recall the day they

7   came to talk to you at your -- at your business?

8        A     I do.

9        Q     And it's right that Agent Bryant Brooks was

10  there along with Sean Gober, another IRS agent?

11       A     Yes.

12       Q     And that occurred on April 12th of 2013?

13       A     Yes.

14       Q     Now, the agents spoke to you about a few

15  different things; is that right?

16       A     Many different things.

17       Q     Is it true that you told the agents that you

18  were aware that banks filed a report when a customer

19  makes a cash deposit of over $10,000?

20       A     Yes.

21       Q     Is it also true that you stated to the agents

22  that it is generally known in the industry to keep your

23  cash deposits below $10,000 to avoid an IRS audit?

24       A     Yes.

25       Q     Is it also true that you told the agents you

1    were not aware that it is a felony to cause a facility

2    or an institution to fail to file a CTR?

3        A    Yes.  I remember that very well.

4        Q    Yes, sir.  Mr. Clyde, this -- I noticed in the

5    agents' report that they indicated that you started your

6    business in 1991 in Orangeburg, Florida, while serving

7    on active duty in the Army.  That's not correct, is it?

8        A    No.

9        Q    All right.  The record will reflect that should

10   be Navy and not Army.

11       A    And there's no such place as Orangeburg,

12   Florida.  I don't know where they came up with that.

13       Q    What should that read?

14       A    Orange Park, Florida.

15       Q    Orange Park.  Orange Park, and it is the Navy

16   and not the Army; is that right?

17       A    That is correct.

18       Q    All right, sir.  Let's move on to Ms. Nichols.

19   You recall this morning Ms. Nichols' deposition was

20   taken?

21       A    Uh-huh.

22       Q    And that's a yes?

23       A    Yes, that's correct.

24       Q    All right.  And Ms. Nichols was also -- strike

25   that.  Ms. Nichols testified that you instructed her to

1    never deposit more than $10,000 in currency into your --

2    into your -- into your bank accounts; is that right?

3         A    That's -- that was my policy.

4         Q    And the reason for your policy is you did not

5    want a report sent to the IRS that would trigger an

6    audit; is that right?

7         A    That's correct.

8         Q    And so, in general terms, did Ms. Nichols

9    testify, in your opinion, truthfully this morning in

10   that regard?

11        A    In that regard.

12        Q    Now, let's talk about Ms. McCauley for a

13   second.  Did you instruct Ms. McCauley as well not to

14   deposit more than $10,000?

15        A    No, I don't think so.  I think Leslie probably

16   did.

17        Q    Nothing had -- when Ms. McCauley joined your

18   company and Ms. Nichols left, your policy didn't change?

19   You still wanted --

20        A    Correct.

21        Q    Is that correct?

22        A    That's correct.  I mean there was no reason to

23   change my policy.

24        Q    So -- so the -- the deposits continued through

25   February and through -- to the end of March, at least

1   for the purposes of this -- this action are consistent

2   with your policy of not depositing more that 10,000?

3       A    Uh-huh.

4       Q    Yes?

5       A    Yes.

6       Q    Mr. Clyde, I want you to explain to me why, in

7   your view, this 109 deposits that were made -- you don't

8   have to go through each one.  I'm just -- this -- this

9   overall pattern, why is this not structured in your

10  opinion?

11      A    In my opinion, the money laundering from what I

12  have learned --

13      Q    Yes, sir.

14      A    -- after April 12th -- the Money Laundering

15  Suppression Act is what deals with structuring.  The

16  point and the purpose of structuring or the point and

17  the purpose of the Money Laundering Suppression Act is

18  to prevent money laundering and tax evasion.  Okay?

19      Q    Yes, sir.

20      A    I understand that.  You know, we have a

21  responsibility to report our income and pay our taxes,

22  and I concur with that.  That's -- that's what you

23  should do, and that's what we have done.  The point of

24  this -- of the Money Laundering Suppression Act -- of

25  structuring is to catch money laundering and tax

1    evasion.   There's no money laundering.   There's no tax

2    evasion.   So I don't -- structuring has no foundation

3    outside of money laundering and tax evasion.   Though you

4    can define what structuring is, you can't define what

5    structuring is not, unless it's a deposit over $10,000.

6    Anything that you have -- and it's proof right there --

7    can be structuring.   You can decide for me any deposit I

8    make is structuring, any solitary one.   You can go from

9    $1628 all the way up to $9,999.   Why not just throw them

10   all in there?   I mean everything I've ever done is

11   structuring according to your definition.   That's wrong.

12   I don't know how you can look at yourself in the mirror,

13   I'm sorry, sir, and say I've done justice.

14        Q     Well -- well, I would point out for the record

15   that -- that I -- I need to, at this point, the role of

16   the U.S. Attorney's Office is to enforce the laws that

17   are enacted by Congress, and to direct it to me

18   personally, which is what I'm taking this as --

19        A     I'm sorry, I apologize.

20        Q     -- is inappropriate?

21        A     I apologize.   I apologize.

22             MR. DANIEL:     That's inappropriate, too.

23             THE WITNESS:       A     I apologize.

24             MR. DANIEL:     You're arguing with my

25        client.

1          THE WITNESS:     A     I apologize.

2          MR. BENNETT:     Q     Fair enough.  I think

3    we're good.

4        A    I apologize.

5        Q    I was asked how I could look at myself.

6        A    Sure, sure.

7        Q    Okay.

8        A    And that was inappropriate.  It was

9    inappropriate.

10       Q    Mr. Clyde, do you think you've been treated

11   fairly in this case?

12       A    No, I don't.

13       Q    Why not?

14       A    For the reasons I just -- because, you know,

15   there's a provision in the law to -- what's the word I'm

16   looking for?  To educate ignorance.  Okay?

17       Q    Yes, sir.

18       A    I believe it's being deliberately overlooked.

19   I'm a good citizen.  I have a good business.  I support

20   the community.  I pay my taxes.  I report my income, and

21   you're coming after me for -- for this, something I

22   didn't even know about, know was illegal or wrong, but

23   not only that, but from what I learned this morning,

24   nobody could even tell me about.  I'm -- I'm sorry,

25   that's why.

1       Q    Yes, sir.

2            MR. BENNETT:    Pete, do you have any

3       other questions for him?

4            MR. PETERMAN:    No.

5            MR. BENNETT:    Michael, do you need to

6       clarify anything?

7            MR. DANIEL:    Yeah, I have a couple of

8       questions for him.

9                      DIRECT EXAMINATION

10      BY MR. DANIEL:

11      Q    You were asked about the report that was

12      required to be filed with the IRS --

13      A    Uh-huh.

14      Q    -- by both Mr. Peterman and I think Mr.

15      Bennett.

16      A    Uh-huh.

17      Q    What was your understanding of the mechanism of

18      how that report was filed?

19      A    Other than I know that the bank filed it, I

20      have -- I don't have an understanding of how it was

21      filed, and I don't have an understanding of whether it

22      was law or whether it was regulation or whether it was

23      policy.  I've never looked at that.

24      Q    So is it your testimony today that you were

25      just completely ignorant of the bank's requirement for

```
1    filing CTRs?
2            MR. PETERMAN:      I object to that form
3        because you're leading your client --
4            THE WITNESS:      A    Under the law --
5            MR. PETERMAN:      -- but he can answer.
6            MR. DANIEL:      Q    What is the understanding
7    that you have with regard to the bank's requirement to
8    file CTRs?
9        A    Under the law, I had no understanding of the
10   legal requirement of the bank to file a CTR.  I did not
11   know that it was a legal requirement.
12           MR. DANIEL:      That's all I have.
13           MR. BENNETT:      I have a follow-up to
14       that.
15           MR. PETERMAN:      You understood that the
16       bank filed a report; you didn't know what
17       caused the bank to file that report, correct?
18           THE WITNESS:      A    When you mean what
19   caused, as in -- as in a deposit or who specified that
20   they file the report?
21           MR. PETERMAN:      Right, you didn't know
22       why the bank was required to file a report?
23           THE WITNESS:      A    That's correct.  That's
24   correct.
25           MR. PETERMAN:      You just knew they were?
```

1          THE WITNESS:      A      I just knew that they

2    did.

3                    RECROSS-EXAMINATION

4    BY MR. BENNETT:

5          Q     If you deposited more than $10,000?

6          A     If you -- well, I thought it was $10,000 or

7    more.  Okay?

8          Q     Right, sure.  So, just to be clear, if you

9    deposit -- your understanding was, if you deposit more

10   than $10,000, that would generate a report, and that

11   report would go to the IRS.  The IRS receiving multiple

12   reports from you, it would be more likely to audit; is

13   that right?

14         A     $10,000 or more?

15         Q     Yes.

16         A     Yes, that is correct, but -- but whether that

17   report was a policy of the bank or whether that report

18   was a legal regulation or a law, I didn't know --

19         Q     I understand.

20         A     -- before April 12th, and honestly, I never

21   thought about that much either.

22         MR. BENNETT:      I don't have any other

23      questions for the witness.  We're done.

24   DEPOSITION CONCLUDED AT 2:01 P. M.

25   ---------------------------------------------------------

1
## CERTIFICATE OF REPORTER

2 GEORGIA, BIBB COUNTY

3          I, Frances Y. Grice, Georgia Certified Court

4 Reporter B-2383, certify that acting in such capacity on

5 August 15, 2013, I reported the testimony of ANDREW

6 CLYDE, and on the foregoing pages, numbered 3 through

7 46, both inclusive, have transcribed or have had

8 transcribed an accurate account of such testimony.

9          I FURTHER CERTIFY that I am not counsel for nor

10 related to any of the parties; nor am I interested in

11 the event or outcome thereof.

12          WITNESS MY OFFICIAL SEAL and signature, this

13 the 19th day of August, 2013.

14

15

16

17          Georgia Certified Reporter B-2383

18

19

20

21

22

23

24

25