Certified Copy

# In the Matter Of:

## U.S.A. vs. U.S. FUNDS

3:13-CV-62

## LESLIE NICHOLS

*August 15, 2013*



800.211.DEPO (3376)
EsquireSolutions.com

Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 3 of 42

LESLIE NICHOLS                                         August 15, 2013
U.S.A. vs. U.S. FUNDS                                                1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

———————————————

UNITED STATES OF AMERICA,          :
    PLAINTIFF,
                        :

    VS.                            CIVIL ACTION FILE
                        :      NO. 3:13-CV-62
$500,000 IN UNITED STATES
FUNDS,                             :
    DEFENDANT PROPERTY,
                        :

CLYDE ARMORY, INC. AND
ANDREW CLYDE,                      :
    CLAIMANTS.

_____

AUGUST 15, 2013          MACON, GEORGIA          10:12 A.M.

    Deposition of LESLIE NICHOLS, called before Laura M.

Jackson, Certified Court Reporter, State of Georgia,

Certificate No. B-959, testimony taken in the offices of

James, Bates, Brannan & Groover, LLP, Suite 100, 231

Riverside Drive, Macon, Georgia, 31201, beginning at

approximately 10:12 a.m., August 15, 2013.



LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                          2

APPEARANCES:

FOR THE PLAINTIFF:              MR. DANIAL E. BENNETT
                                MR. G.F. "PETE" PETERMAN, III
                                U.S. Department of Justice
                                U.S. Attorney's Office
                                Post Office Box 1702
                                300 Mulberry Street
                                Macon, Georgia  31202-1702
        MR. BENNETT'S EMAIL:    danial.bennett@usdoj.gov
        MR. PETERMAN'S EMAIL:   pete.peterman@usdoj.gov


FOR THE CLAIMANTS:              MR. MICHAEL C. DANIEL
                                Prior, Daniel & Wiltshire
                                490 North Milledge Avenue
                                Athens, Georgia  30601
                                mdaniel@pdwlawfirm.com


ALSO PRESENT:

FOR MS. NICHOLS:                MR. GRANT GREENWOOD
                                James, Bates, Brannon & Groover
                                231 Riverside Drive
                                Macon, Georgia  31201
                                ggreenwood@jamesbatesllp.com

                                MR. ANDREW CLYDE
                                Clyde Armory, Inc.

Reporter's Note:                Witness WAIVES reading and
                                signing of the document.

                            INDEX

CROSS EXAMINATION                              3
BY MR. DANIEL



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 5 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                            3

1   STIPULATIONS:

2         MR. DANIEL:        This is the deposition of

3   LESLIE NICHOLS.  It's being taken pursuant to notice and

4   a subpoena to Ms. Nichols.  We're going to have the same

5   reservations that we had earlier, pursuant to the

6   Federal Rules.  Is that correct?

7         MR. BENNETT:        That's fine with the

8   government.

9                    _____

10                        LESLIE NICHOLS

11                  Witness having been first

12                  duly sworn, testified on

13                    CROSS EXAMINATION

14  BY MR. DANIEL:

15      Q    Ms. Nichols, would you please state your name for

16  the record?

17      A    Leslie Jane Nichols.

18      Q    My name is Michael Daniel and I'm going to be

19  asking you some questions about what you know about the case

20  that's been filed against Andrew Clyde and Clyde Armory.  I

21  represent Mr. Clyde.  Just going to ask you about the

22  knowledge you have about that matter.  If you don't

23  understand my question, tell me that you didn't understand

24  the question and I'll repeat it.  Same, likewise if you don't

25  hear my question let me know you didn't hear me or you didn't



1    understand me and I'll rephrase the question, okay?

2         A    Okay.

3         Q    Is there any medical reason that would prevent you

4    from providing truthful testimony today?

5         A    No.

6         Q    If you answer my question I'm going to assume that

7    you understood and heard the question, okay?

8         A    Okay.

9         Q    Let's start off, where are you currently residing?

10        A    I live in Perry, Georgia.  My address is 814

11   Washington Street, Perry, Georgia, 31069.

12        Q    Would you tell me your educational background

13   beginning with high school?

14        A    I finished high school in 2001 from Houston County

15   High school in Warner Robins, Georgia.  I then attended the

16   University of Georgia and got a Bachelor's in accounting.  I

17   finished college in 2006.  Then finished my Master's degree

18   from Liberty University also in accounting and that was

19   completed in May of this year, 2013.

20        Q    Were you born and raised in Houston County?

21        A    I was born in Athens, Georgia.  My family moved to

22   Houston County when I was four years old.

23        Q    You lived there until you went back to the

24   University of Georgia?

25        A    Yes.

1    Q    Tell me about your employment history beginning

2  during college and after college.

3    A    During college I worked for the chemistry

4  department on campus in their main office part time.  After

5  college I went to work for the International Mission Board,

6  which is a mission's agency.  I worked for them from 2006

7  through 2009.  My first two years of employment I was located

8  in Indonesia.  The third year I was back in the states and

9  lived in Birmingham, was based out Birmingham, Alabama.

10       After that I moved to Wake Forest, North Carolina, and

11  worked in an assisted living facility, Alta Oakridge in

12  Raleigh, North Carolina while I attended seminary.  I

13  attended two semesters of seminary and then decided I would

14  like to pursue a job using my accounting background and

15  degree and discovered the job opening at Clyde Armory through

16  Brett Jamison, who is employed there.  So in August of 2010 I

17  began work for Clyde Armory.

18       Last November my father approached me about working for

19  him.  He's a public accountant in Warner Robins.  So in late

20  January of this year I left Clyde Armory and went to work for

21  my dad at Nichols, Cauley, and Associates.

22    Q    And that's in Perry?

23    A    It's in Warner Robins.

24    Q    Warner Robins.  That's an accounting firm?

25    A    Yes, sir.



```
 1      Q     And your dad's a principal of that firm?

 2      A     He's a partner, yes, sir.

 3      Q     What are you currently doing?  What are your job

 4 responsibilities with your dad's firm?

 5      A     I'm a staff accountant.  I work on anything from

 6 audits to tax returns, basic bookkeeping services when

 7 necessary.

 8      Q     Now, let's go back to August of 2010.  You said

 9 that was when you started with Clyde Armory?

10      A     Yes, sir.

11      Q     Did you start as a full time employee?

12      A     I did.

13      Q     Would you tell me what your duties and

14 responsibilities were when you started at Clyde Armory?

15      A     My title was financial manager and I handled a lot

16 of the basic bookkeeping, accounting services for the

17 company.  Writing checks, preparing bank reconciliations,

18 reconciling the day to day activities of the registers from

19 the sales floor.  I would make deposits on a fairly regular

20 basis every day if not every other day.  I would also handle

21 some main office, you know, stocking the office supplies,

22 that sort of thing.

23      Q     Did those duties change at all during the period

24 you worked for Clyde Armory?  It looks like you worked in the

25 neighborhood of two years.
```



1       A      Two and a half years.

2       Q      August 2010 to June 2013?

3       A      January.

4       Q      I'm sorry.   January.

5       A      Uh-huh, (affirmative).

6       Q      Did those duties change at all during your --

7       A      They increased and grew over the two and a half

8   years I was working there so my responsibilities became a bit

9   heavier I guess you could say.   Later in my time I became

10  responsible for getting quotes for our insurance, Workers'

11  Comp, or property insurance, business insurance, that sort of

12  thing.   Just a natural progression of duties, I guess.

13      Q      Andrew Clyde was your boss, is that correct?

14      A      Yes, sir.

15      Q      Did you report directly to Mr. Clyde or did you

16  have somebody in between you and Mr. Clyde?

17      A      I reported directly to him.

18      Q      What would be your opinion with regard to whether

19  Mr. Clyde gave you autonomy to perform your job?

20      A      Within my first year of employment he monitored my

21  job very closely.   After that I had a bit more autonomy in my

22  day to day routine or activities of what I needed to do.   I

23  had a set of tasks which needed to be done, but I could

24  choose when they were going to be done and that sort of thing

25  and he would still monitor my work just not as heavily as the

1   first year.

2       Q    What would be your opinion as to whether or not Mr.

3   Clyde would accept your recommendations or suggestions on how

4   to do your job?

5       A    I think especially after the first year if I had

6   suggestions I felt comfortable making them to Andrew.  He was

7   usually very open to suggestions I had.  He wouldn't always

8   take them, but we could have an open discussion about them.

9   Sometimes he would move forward with it and sometimes for

10  reasons that he had, he would not.

11      Q    How would you generally describe Mr. Clyde as a

12  boss?

13      A    He's a fair boss.  He's fine to work for, easy to

14  work for.  I think my first year I wasn't sure how my

15  performance was for him, but after my one year evaluation we

16  had a good conversation and after that our working

17  relationship really improved a lot.  I felt comfortable

18  working for him.  I knew what was expected of me.  I didn't

19  really have any problems.

20      Q    Do you have an opinion as to Mr. Clyde's character

21  and integrity?

22      A    I think he is a man of integrity.  I think he's

23  honest and fair.

24      Q    Are you aware of any charitable work Mr. Clyde has

25  done in the Athens community?



LESLIE NICHOLS
U.S.A. vs. U.S. FUNDS

August 15, 2013
9

1      A    Yes.  Specifically he is involved with the Athens

2  Pregnancy Center in Athens, which is a non profit

3  organizations.  For reasons I guess their bylaws did not

4  allow the business -- the non profit organization to go into

5  debt, so Andrew purchased a building for them to use as their

6  facility and incurred the debt himself and they made monthly

7  payments to him basically just to pay down the mortgage.

8  Once the principle was paid off the building would then be

9  granted to the non profit.  I know since I've left employment

10  that building has been completely paid off and I believe

11  Andrew made that payment to pay off the building and gave the

12  building to the organization as a charitable contribution.

13  He is involved with their board of directors, I believe.

14      Q    Let's talk about the procedures on depositing cash.

15      A    Okay.

16      Q    Do you have an opinion as to why a gun store would

17  come across cash on a regular basis?  Did you work on the

18  floor?

19      A    I did not work on the sales floor.  I did reconcile

20  the cash deposits to what our computer system said we had

21  received in cash every morning.  That was part of my

22  responsibility.  So I handled the cash the next day once it

23  was brought in off the floor.

24      Q    Is that through the point of sales system?

25      A    Yes.  Yes, it is.



1      Q     Can you describe for me what the point of sales

2  system was and how it worked?

3      A     We used a program called One Step.  Is that what it

4  was called?  Yes, I believe, One Step.  When I first started

5  in August that's the program we used as our point of sales

6  system.  We used that until April of 2011 when we switched to

7  Quick Books point of sale.  Quick Books point of sale system

8  is just a basic point of sale system that we had some

9  modifications to to allow -- our business was unique in that

10  we had serial number enforcement, meaning we had to keep

11  track of each and every serial number.  So we had some

12  modifications to the software, but for the most part --

13      Q     When you say serial number enforcement you're

14  talking about serial numbers on the fire arms that are sold

15  in the store?

16      A     Correct.  So we had to keep track of serial

17  numbers.  So we did make modifications to the point of sale

18  software, but financially it worked just like it would for

19  any other company.  So a sale would be made on the sales

20  floor.  The sales floor associate would ring up -- tender the

21  transaction, take payment.  In the system you could specify

22  if it was a Visa, MasterCard, Discover, or if it was cash or

23  a check.  So they would specify what form of payment the

24  customer had used and tender the sale.  At the end of the day

25  the sales floor manager and sales floor associates would

1   close the register, meaning they would count all the cash,

2   make sure -- they would run a report in the point of sale

3   system, count the cash, make sure the two matched.  If not,

4   they would try to find any discrepancies.  They'd also look

5   -- we had a credit card system that we used so they would

6   look at the credit card report and make sure it matched what

7   our point of sales said, try to find any discrepancies there.

8   But typically any discrepancies weren't discovered that

9   evening.  The next morning I would take that deposit and kind

10  of go through that process again and really dig down and try

11  to find the discrepancies.

12       Q    Are you familiar with the concept of a lock box

13  program in the point of sale system program?  Are you

14  familiar with that concept?

15       A    I'm not sure I understand what you're asking.

16       Q    The concept is whether when it goes in the point of

17  sale system does it then automatically flow into the Quick

18  Books and can't be modified, can't be manipulated?

19       A    The program itself or an actual box?

20       Q    The program.

21       A    Okay.  I'm not sure I've heard that terminology

22  used in the program before so I'm not exactly sure what

23  you're asking.

24       Q    Well, let me ask it this way.  When cash goes into

25  the system it's tracked all the way through the system into



1  Quick Books, is that correct?

2       A    In the point of sale system, yes.  And you can't

3  change that or modify that.  Every morning I would have to

4  update our financial software.  So we had two different

5  programs, one for point of sale and one for financial

6  reporting and they would sync together.  So in the financial

7  software you can change things.  There's a little more

8  freedom in changing information.  However, that is kept in a

9  log within the software.  So there's an -- audit trail

10  report, is the name of the report and you can see every

11  change that's made to a transaction if you run that report.

12       Q    Were you responsible for monitoring the cash coming

13  in to the point of sales and seeing that it goes over to the

14  Quick Books program?  Was that a part of your responsibility?

15       A    Yes.

16       Q    And also as part of your responsibility did you

17  work with Clyde Armory's accountant in providing information

18  regarding tax returns and things of that nature?

19       A    Yes.

20       Q    Would you tell me what your involvement was there

21  and what the procedure was?

22       A    Eddie Patat is the name of the accountant Andrew

23  uses for his taxes.  I would say my first year or two of

24  employment I didn't have as much interaction, but by the last

25  year and a half or so I had more interaction with Eddie.  He



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 15 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                          13

1   would come to the store, to our location.  We had a computer

2   set aside for him to use to access our system as he needed.

3   He would look through transactions, look through our Quick

4   Books financial software.  If he had questions, he would ask

5   me.  If I knew the answer I would provide it to him.  If not,

6   I would default to Andrew.  So anything business related that

7   I could help him with I would or we would explain things.

8   Andrew was often involved with those conversations as well.

9   Then it kind of left my hands and he also handled Andrew's

10  personal tax returns and I didn't have anything to do with

11  that side of things.

12      Q    Based on your involvement in this financial

13  procedure did you ever observe anything that you felt was

14  inappropriate?

15      A    No.

16      Q    Prior -- you met with two federal agents on or

17  about April 17, 2013.  Is that correct?

18      A    Yes.

19      Q    And they discussed with you deposits that were cash

20  deposits that were made by Andrew Clyde?

21      A    Yes.

22      Q    And Clyde Armory?

23      A    Yes.

24      Q    Into Robins Federal Credit Union account?

25      A    Yes.



1      Q      Prior to that date did you even know what the term
2  "structuring" meant?

3      A      I did not.

4      Q      Have you ever known about the requirements of
5  Federal Law 31 USC Section 5313(A)?

6      A      I don't know the specifications of that.  I don't
7  know what that says or have ever heard that.

8      Q      The reporting requirements.  It addresses the
9  reporting.  Did you learn about that in your accounting
10  classes?

11      A      Not that I'm aware of.

12      Q      So you don't have a working knowledge of what's
13  required of a bank when they receive cash?

14      A      At that time, no.  I've since done some research
15  and learned a little bit about it, not a lot.

16      Q      But as of April 17, 2013, no?

17      A      No.

18      Q      Now, when you left in January of 2013, a new
19  bookkeeper, and I'm struggling with her name, Johnnie --

20      A      McCauley.

21      Q      -- McCauley.  You actually worked with her?  Is
22  that correct?

23      A      She and I worked together for roughly a week before
24  my employment ended and then Clyde Armory hired Nichols,
25  Cauley, and Associates, who I currently work for, to have me



LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                          15

1   come back and continue training.  So three different

2   instances I came back for two days each instance and

3   continued training with her through February and March.

4       Q    Let's go back to these cash deposits.  Were you

5   aware of any events that caused an increase in gun sales

6   during the period of time that you worked?

7       A    Absolutely.  November 2012 when Obama was re-

8   elected I think the community, especially people who purchase

9   guns, felt that that might -- his administration may restrict

10  gun purchases in the future so they kind of wanted to

11  purchase guns before that happened.  So that happened

12  November.  Thanksgiving happened, that's always a busy time

13  for us.  So sales were up the end of November as well.  Then

14  in December when the Sandy Hook incident happened and it

15  seemed there might be legislation passed to really restrict

16  certain types of weapons, which we sold, sales were through

17  the roof.  Something that I've never seen before, not like

18  anything that could have been expected, very unusual

19  circumstances.

20      Q    Did these events cause a spike in cash on hand?

21      A    Absolutely.

22      Q    Can you tell me exactly what procedures have you

23  followed in depositing cash?  First off, Robins Federal

24  Credit Union was where all of the cash was deposited?  Is

25  that correct?



1      A     That's correct.

2      Q     There was another -- just tell me the accounts.

3      A     We had a savings and checking account with Robins

4   Federal Credit Union and cash and checks would be deposited

5   into the savings account at Robins Federal Credit Union.  We

6   also had an operating account out of Wells Fargo where we had

7   a couple of checking accounts.  Andrew had some accounts for

8   other businesses there, but typically our main checking

9   account for operating purposes with Clyde Armory was kept at

10  Wells Fargo.  Our credit cards would be deposited -- any

11  credit card receipts we had would be deposited into that

12  account and our main operations, day to day checks, that we

13  sent to vendors would come from that account.  So

14  periodically I would transfer money with a check from Robins

15  Federal Credit Union to our Wells Fargo operating account and

16  move the cash between banks.

17     Q     So you had access to those accounts?

18     A     I had visual access.  I had no signing authority.

19  I would cut the check and Andrew would sign.  With Robins

20  Federal Credit Union Andrew was the only person who was able

21  to sign.  With Wells Fargo -- during my time of employment

22  they added Brett Jamison also as a signer on the Wells Fargo

23  checking account.

24     Q     Would you please tell me what you mean when you say

25  you had visual authority?



1      A    I could see things.  We had an online banking

2   system so I had access to user log in and that sort of thing

3   and could -- at Wells Fargo I only had view only access,

4   meaning I couldn't transfer money between accounts or do

5   anything other than view the activity and print bank

6   statements.  At Wells Fargo I had a user name and log in,

7   which I could transfer money from savings to checking but

8   couldn't transfer to an outside entity, only within those

9   accounts.

10      Q    To your knowledge was there anybody else at Clyde

11   Armory who had viewing authority?

12      A    To my knowledge Andrew Clyde and I are the only two

13   that had viewing authority.  I don't believe Brett Jamison

14   had viewing authority.  When I first started Sheila Garrett

15   had viewing authority.  She had previously kept the books for

16   Clyde Armory and fully transitioned away from that position

17   as I came on.  So for a little while she had viewing access

18   to those accounts and then those were removed from her.  Then

19   as I left we added Johnnie McCauley to have viewing access as

20   she was taking over my position.

21      Q    Did you have viewing access from the very beginning

22   or was there a point in which you were given viewing access?

23      A    From the beginning I had it.

24      Q    Now, when you have viewing access to a bank account

25   that means you look at the account periodically.  Would you



1 tell me how often you would review the account?

2      A      I would review it several times a week.  Sometimes

3 daily but if not, at least every two days I was looking at

4 that account and would always reconcile bank statements at

5 the end of the month.

6      Q      Back to these cash deposits.  Tell me what the

7 procedure was for depositing cash at Robins Federal Credit

8 Union.

9      A      As I mentioned earlier, the sales floor associates,

10 sales floor manager would count the cash at the end of the

11 day.  They would put it into a money bag and store it in our

12 vault in the office.  The next morning when I came to work

13 I'd get the money bag from the vault, recount all the cash,

14 verify that it matches the report from the point of sale

15 system, the end of day report is what it's called, that

16 details how much cash was taken in over the sales floor

17 across all the registers.  So I would verify that the two

18 amounts matched.  If there were any discrepancies I would try

19 to uncover what the discrepancy was.  Then otherwise I would

20 take that deposit or that amount of cash and prepare a

21 deposit in our Quick Books financial software, basically in

22 the software telling it how much money I'm going to deposit.

23 I would deposit any checks that we had received from

24 customers and cash.

25      So if that amount was more than $10,000 I would hold



1  back a little bit and make it an arbitrary number under

2  $10,000, between $9,500 and $9,900, somewhere in there, that

3  range typically.  I would hold back some of the cash and

4  deposit what was remaining.  That wasn't a frequent

5  occurrence that I had to hold back cash until business picked

6  up in late November.

7       Q    And why did you hold back that cash?

8       A    From the beginning of my employment Andrew made it

9  clear that he preferred I hold back -- I not deposit more

10 than $10,000 because he was aware that a report was filed to

11 the IRS for any cash deposits more than $10,000, and the idea

12 was the more reports were filed the more likely you would

13 have -- more likely chance there would be for you to get an

14 IRS audit, which was a hassle and no one would want that.

15      Q    Did you Andrew ever talk to you specifically about

16 his understanding regarding the nature of the report or did

17 he just use the term report?

18      A    Just the term report.  Pretty much what I described

19 just now was the extent of the conversation that he and I had

20 or knowledge that was shared.

21      Q    Now, as far as the deposits while you were working

22 there were you primarily responsible for making the deposits?

23      A    Yes.

24      Q    You would do that on what frequency?

25      A    Typically daily.  If not much money was in, I might



1  hold off and wait until the next day.  So if not every day,

2  every other day.

3      Q    I believe you testified earlier that you were not

4  required -- you were not aware of the reporting requirements

5  prior to your meeting with these federal agents.  Is that

6  correct?

7      A    Yes.

8      Q    So you didn't advise Andrew regarding reporting

9  requirements?

10     A    No.

11     Q    I don't have a copy of this.  I'm going to ask you

12 to look on my computer if you would.

13     A    Okay.

14         MR. DANIEL:        Grant, I'm going to come around

15     if that's okay.

16         MR. GREENWOOD:     Yeah.

17         MR. DANIEL:        Dan, this is a document she

18     provided and the number is starting USADEB 23.

19         MR. BENNETT:       Yes, sir.

20     Q    MR. DANIEL:        This is what the government has

21 provided to us, which they contend are the structured

22 activities.  Okay?

23     A    Okay.

24         MR. BENNETT:       I think I might have a copy, a

25     paper copy of it here if you just want to take a second.



LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                          21

1      MR. DANIEL:        Yeah.

2      MR. BENNETT:        Let me look and see if I've got

3  it for you.  That might help.  It just occurred to me I

4  might have it with some things.  Twenty what?

5      MR. DANIEL:        23.  Poor planning on my part.

6  I should have had a copy of it.

7      MR. BENNETT:        No problem.  Let me see if I

8  have it.  Michael, here's the one I gave you in

9  discovery.  It's Bates 220, 221, and 222.  That's the

10 recent version.  It's the same table though.

11     MR. DANIEL:        Is that the table that was in

12 that original complaint?

13     MR. BENNETT:        It is.

14     MR. GREENWOOD:        She's got that.

15     MR. DANIEL:        Just so we can refer to it at

16 trial if we need to.  Is this the most recent rendering?

17     MR. BENNETT:        It is.  And we've listed it --

18 I can give you the exhibit number that we've assigned to

19 it if you want to wait just a second and let me find the

20 pre-trial order.

21     MR. GREENWOOD:        It has not changed, has it?

22     MR. BENNETT:        It has not changed.  It is the

23 same.  Michael, we've listed it as P-12.  It's the

24 financial and analysis worksheet created by task force

25 agents Brian Morose and Sean Gober, spelled G-O-B-E-R.



1      It's Plaintiff's Exhibit 12.

2  (BREAK)

3      Q    MR. DANIEL:        I've marked as an exhibit

4  Claimant's Exhibit 1, which will be part of the deposition,

5  which is their Exhibit 9 to the pre-trial.  Before we get to

6  this, did you and Andrew ever have a conversation regarding a

7  carrying permit for a weapon?

8      A    I don't believe so.

9      Q    Did he ever discuss security concerns with the

10 cash, how you deliver cash?

11     A    Can you specify?

12     Q    When you were taking cash to the bank you place it

13 in some type of container.  What kind of container do you

14 place it in, the cash?

15     A    We had a money bag from the bank I would use.  Then

16 typically I would put that in my purse.

17     Q    And then you would drive yourself to the bank to

18 deposit the money?

19     A    That's correct.

20     Q    Did you ever have any conversations about the

21 security of going from his armory to the bank?

22     A    Not specific conversations that I can recall.

23     Q    Any general conversations about security in

24 general?

25     A    I mean, I know -- I'm not sure if it was Andrew --



Case 3:13-cv-00062-CDL    Document 30    Filed 08/22/13    Page 25 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                           23

1    I don't recall specifically having that conversation with

2    Andrew.   Another employee would always, you know, whenever I

3    left tell me to be careful, that sort of thing.   But not a

4    specific employment, this is your duty, please do this

5    instruction.

6        Q    Who was that employee?

7        A    Ronnie Erwin.   He was a former police officer.   He

8    would always tell me to be careful.

9            MR. PETERMAN:       What was his last name?

10           THE WITNESS:       Erwin, E-R-W-I-N.

11           MR. PETERMAN:       Thank you.

12       Q   MR. DANIEL:        If you would look at Claimant's

13   1 that's in front of you there.

14       A   Uh-huh, (affirmative).

15       Q   You see dates of deposits May 3, 2012?

16       A   Yes.

17       Q   Then it goes all the way to March 25, 2013?

18       A   Uh-huh, (affirmative).

19           MR. GREENWOOD:      Yes or no.

20       A   THE WITNESS:       Yes.  I see that.

21       Q   I forgot to tell you.  She's taking down everything

22   that we're saying verbatim so uh-uh, (negative), or uh-huh,

23   (affirmative) doesn't work.  If you would look on that list

24   and tell me to the best of your knowledge, which was your

25   last deposit.



1       A    Can I look at a calendar real quick.

2           MR. BENNETT:        I have one for you.  I have

3       this one I've provided.

4           THE WITNESS:        Perfect.

5           MR. BENNETT:        I want to make sure it's all

6       right with Michael.

7           MR. DANIEL:         That's fine.  I don't think we

8       need to mark that calendar.

9           THE WITNESS:        Just January.

10      A    THE WITNESS:         I believe my last day of

11  employment was Wednesday, January 30th, I think.  It could

12  have been the 29th.  Either the 29th or 30th, I don't recall

13  specifically which day I left at this point.

14      Q    All right.  If you'll look at the exhibit and turn

15  to 221.  You'll see counter numbers running down the left

16  side.

17      A    Yes.

18      Q    And if you'll go to 68 and 69.

19      A    Uh-huh, (affirmative).

20      Q    Would you say it was approximately one of those

21  deposits?

22      A    Yes.  One of those deposits.

23      Q    Now, going from one to 68 or 69 to the best of your

24  recollection did you make all of these deposits?

25      A    I would assume I made most of these deposits.

Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 27 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                         25

1   Andrew may have made a deposit if I was out of town, or very

2   rarely he would make a deposit on Saturday.  So if these were

3   Saturday deposits it was mostly likely him who made it.

4   Otherwise it was me unless I was out of town or sick.

5        Q    Let me get you to look at counter number six.  It's

6   a 07/25/2012 deposit, 12:45 p.m. for $2009.

7        A    Yes, sir.

8        Q    It looks like the majority of your deposits were in

9   the $9000 range.  Why was that deposit at $2009?

10       A    Because that's all the cash that had come in the

11  day before or that I had to deposit.

12       Q    And then if you look at counter number eight,

13  $2802.

14       A    Yes.

15       Q    Would that be the same?

16       A    Yes, sir.

17       Q    Counter number ten, the same?

18       A    Yes, sir.

19       Q    And you've got one, counter number 11 for $7260.

20  Again, that's not in the $9000 number.  Do you know why that

21  deposit is not in the $9000 range?

22       A    Because there was not enough -- that's all the cash

23  I had, $7260, I would assume.

24       Q    And then the next one?

25       A    Correct.  The same thing.



1      Q    Is it fair to say that if the deposit was greater,

2    the cash that came in was greater than $10,000, that's when

3    you made the $9000 plus deposit?

4      A    Correct.  If there is anything less than $9000 it's

5    because that's all there was to deposit.  If there's anything

6    greater than $9000 it could be the exact amount that had come

7    in the day before or approximately the amount that came in

8    the day before.  It could be that we had more than $10,000

9    and I had to pull some back.

10     Q    Let's go down to counter number 28.

11     A    Okay.

12     Q    When it was more than $10,000 did you have a level

13   that you set?  Would $9065 be the cash that came in?

14     A    To tell you absolutely I would want to look at the

15   point of sale report from the prior day, but my assumption

16   would be that I did not have more than $10,000 on that

17   deposit.

18     Q    33, the same?

19     A    Yes, sir.

20     Q    42, the same?

21     A    Yes, sir.

22     Q    56, the same?

23     A    No.  That I would hesitate to say yes to.  Just the

24   time of that was once business had really picked up and we

25   had cash on hand.  I'm not sure why I only deposited $8,800,

Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 29 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                          27

1   but I would assume that I had more on hand that was available

2   to deposit.  I'm not sure why it's less than $9,000.

3        Q    And you're saying that because of the date of the

4   deposit?

5        A    Yes, sir.

6        Q    What about 77?

7        A    I was not employed at that time.

8        Q    Okay.  So other than the -- it's looking like to me

9   that all of the deposits that were in excess where you had

10  more than $10,000 cash in hand that you were at least making

11  it more than $9,500?

12       A    Typically, yes.

13       Q    Anything below that, other than that one entry,

14  would be because that was all the cash that was on hand?

15       A    Correct.

16       Q    Do you have any reason to believe that this cash

17  was not legitimate business revenue?

18       A    I believe all of it was business revenue.

19       Q    Do you have any reason to believe or information to

20  suggest that this cash was not properly accounted for in the

21  tax system at Clyde Armory?

22       A    I believe it was accounted for properly for taxes.

23            MR. DANIEL:         Let me step out with Andrew.

24  (OFF THE RECORD)

25            MR. BENNETT:         I don't have any questions.



LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                                          28

1         Q    MR. DANIEL:    I just have one more.  Did Mr.

2    Clyde ever pay for you to have a carrying permit?

3         A    Oh, he did.  Yes.  He reimbursed me for that or

4    paid for that.

5         Q    Did you actually get a weapon pursuant to that

6    carrying permit?

7         A    I did.

8         Q    What kind of weapon did you get?

9         A    A Sig P232.

10        Q    Did you carry that weapon with you when you made

11   these deposits?

12        A    I did not.

13        Q    Did you keep it at your personal residence?

14        A    Yes.

15        Q    Or did you keep it at work with you?

16        A    It was at my house.

17        MR. DANIEL:        Okay.  That's all I have.

18        MR. BENNETT:       I have no questions for the

19        witness.

20   (DEPOSITION CONCLUDED 11:00 A.M.)

21

22

23

24

25



D I S C L O S U R E


STATE OF GEORGIA,

COUNTY OF BIBB:


Deposition of:   LESLIE NICHOLS


Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as a representative of Hawthorne & Webb Court Reporting.

Hawthorne & Webb Court Reporting was contacted by the offices of Esquire Deposition Solutions, LLC, to provide court reporting services for this deposition.  Hawthorne & Webb Court Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

Hawthorne & Webb Court Reporting has no contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Hawthorne & Webb Court Reporting will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Dated:  August 15, 2013


_____, CCR B-959
Certified Court Reporter



CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY;

    I, Laura M. Jackson, CCR, B-959, CERTIFY that acting in such capacity on August 15, 2013, I reported the testimony of LESLIE NICHOLS, and on the foregoing pages, numbered 3 through 28, both inclusive, have transcribed a true, accurate and complete transcript of the same.

    I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or the outcome thereof.

    WITNESS my hand and official seal this 17th day of August, 2013.

Certificate Number B-959



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 33 of 42

LESLIE NICHOLS
U.S.A. vs. U.S. FUNDS

August 15, 2013
Index: $10,000..approached

**$**

**$10,000**
18:25
19:2,10,
11 26:2,
8,12,16
27:10

**$2009**
25:6,9

**$2802**
25:13

**$7260**
25:19,23

**$8,800**
26:25

**$9,000**
27:2

**$9,500**
19:2
27:11

**$9,900**
19:2

**$9000**
25:9,20,
21 26:3,
4,6

**$9065**
26:13

**0**

**07/25/2012**
25:6

**1**

**1**  22:4
23:13

**11**  25:19

**11:00**
28:20

**12**  22:1

**12:45**  25:6

**17**  13:17
14:16

**2**

**2001**  4:14

**2006**  4:17
5:6

**2009**  5:7

**2010**  5:16
6:8 7:2

**2011**  10:6

**2012**  15:7
23:15

**2013**  4:19
7:2 13:17
14:16,18
23:17

**220**  21:9

**221**  21:9
24:15

**222**  21:9

**23**  20:18
21:5

**25**  23:17

**28**  26:10

**29th**  24:12

**3**

**3**  23:15

**30th**
24:11,12

**31**  14:5

**31069**  4:11

**33**  26:18

**4**

**42**  26:20

**5**

**5313(A)**
14:5

**56**  26:22

**6**

**68**  24:18,
23

**69**  24:18,
23

**7**

**77**  27:6

**8**

**814**  4:10

**9**

**9**  22:5

**A**

**A.M.**  28:20

**absolutely**
15:7,21
26:14

**accept**  8:3

**access**
13:2
16:17,18
17:2,3,
17,19,21,
22,24

**account**
13:24
16:3,5,6,
9,12,13,
15,23
17:24,25
18:1,4

**accountant**
5:19 6:5
12:17,22

**accounted**
27:20,22

**accounting**
4:16,18
5:14,24
6:16 14:9

**accounts**
16:2,7,17
17:4,9,18

**activities**
6:18
20:22

**activity**
17:5

**actual**
11:19

**added**
16:22
17:19

**address**
4:10

**addresses**
14:8

**administrat
ion**  15:9

**advise**
20:8

**affirmative**
7:5
23:14,18,
23 24:19

**agency**  5:6

**agents**
13:16
20:5
21:25

**Alabama**
5:9

**Alta**  5:11

**amount**
18:20,25
26:6,7

**amounts**
18:18

**analysis**
21:24

**Andrew**
3:20 7:13
8:6 9:5,
11 12:22
13:6,8,20
16:7,19,
20 17:12
19:8,15
20:8
22:6,25
23:2 25:1
27:23

**Andrew's**
13:9

**approached**
5:18



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 34 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS               Index: approximately..chance

approximately 24:20
5:12,13
26:7

April 10:6
13:17
14:16

arbitrary 19:1

armory 3:20
5:15,17,
20 6:9,
14,24
13:22
14:24
16:9
17:11,16
27:21

Armory's 12:17

arms 10:14

assigned 21:18

assisted 5:11

associate 10:20

associates 5:21
14:25
18:9

assume 4:6
24:25
25:23
27:1

assumption 26:15

Athens 4:21 8:25
9:1,2

attended

audit 12:9
19:14

audits 6:6

August 5:16 6:8
7:2 10:5

authority 16:18,25
17:11,13,
14,15

automatically 11:17

autonomy 7:19,21

aware 8:24
14:11
15:5
19:10
20:4

—————————

—————————
                B
—————————

Bachelor's 4:16

back 4:23
6:8 15:1,
2,4 18:6
19:1,3,5,
7, 26:9

background 4:12 5:14

bag 18:11,
13 22:15

bank 6:17
14:13
17:5,24
18:4
22:12,15,
17,21

banking 17:1

banks 16:16

based 5:9
13:12

basic 6:6,
16 10:8

basically 9:7 18:21

basis 6:20
9:17

Bates 21:9

began 5:17

beginning 4:13 5:1
17:21,23
19:8

BENNETT 3:7
20:19,24
21:2,7,
13,17,22
24:2,5
27:25
28:18

Birmingham 5:9

bit 7:8,21
14:15
19:1

board 5:5
9:13

bookkeeper 14:19

bookkeeping 6:6,16

books 10:7
11:18
12:1,14

13:4
17:15
18:21

born 4:20,
21

boss 7:13
8:12,13

box 11:12,
19

BREAK 22:2

Brett 5:16
16:22
17:13

Brian 21:25

brought 9:23

building 9:5,8,10,
11,12

business 7:11 9:4
10:9 13:6
19:5
26:24
27:17,18

businesses 16:8

busy 15:12

bylaws 9:3

—————————
                C
—————————

calendar 24:1,8

called 10:3,4
18:15

campus 5:4

card 11:5,
6 16:11

cards 16:10

careful 23:3,8

Carolina 5:10,12

carry 28:10

carrying 22:7
28:2,6

case 3:19

cash 9:14,
17,20,21,
10:22
11:1,3,24
12:12
13:19
14:13
15:4,20,
23,24
16:4,16
18:6,7,
10,13,16,
20,24
19:3,5,7,
11 22:10,
12,14
25:10,22
26:2,13,
25 27:10,
14,16,20

Cauley 5:21
14:25

caused 15:5

Center 9:2

chance 19:13



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 35 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                    Index: change..deposited

**change**
6:23 7:6
12:3,7,11

**changed**
21:21,22

**changing**
12:8

**character**
8:20

**charitable**
8:24 9:12

**check**
10:23
16:14,19

**checking**
16:3,7,8,
23 17:7

**checks**
6:17
16:4,12
18:23

**chemistry**
5:3

**choose**
7:24

**circumstanc
es** 15:19

**Claimant's**
22:4
23:12

**classes**
14:10

**clear** 19:9

**close** 11:1

**closely**
7:21

**Clyde**
3:20,21
5:15,17,
20 6:9,

14,24
7:13,15,
16,19
8:3,11,24
12:17
13:20,22
14:24
16:9
17:10,12,
16 27:21
28:2

**Clyde's**
8:20

**college**
4:17 5:2,
3,5

**comfortable**
8:6,17

**community**
8:25 15:8

**Comp** 7:11

**company**
6:17
10:19

**complaint**
21:12

**completed**
4:19

**completely**
9:10

**computer**
9:20 13:1
20:12

**concept**
11:12,14,
16

**concerns**
22:9

**CONCLUDED**
28:20

**container**
22:13

**contend**
20:21

**continue**
15:1

**continued**
15:3

**contributio
n** 9:12

**conversatio
n** 8:16
19:19
22:6 23:1

**conversatio
ns** 13:8
22:20,22,
23

**copy**
20:11,24,
25 21:6

**correct**
3:6 7:13
10:16
12:1
13:17
14:22
15:25
16:1 20:6
22:19
25:25
26:4
27:15

**couldn't**
17:4,8

**count**
11:1,3
18:10

**counter**
24:15
25:5,12,
17,19

26:10

**County**
4:14,20,
22

**couple**
16:7

**created**
21:24

**credit**
11:5,6
15:24
16:4,5,
10,11,15,
20 18:7

**CROSS** 3:13

**customer**
10:24

**customers**
18:24

**cut** 16:19

_____

_____
                 **D**
_____

**dad** 5:21

**dad's** 6:1,
4

**daily** 18:3
19:25

**Dan** 20:17

**Daniel**
3:2,14,18
20:14,17,
20 21:1,
5,11,15
22:3
23:12
24:7
27:23
28:1,17

**date** 14:1

27:3

**dates**
23:15

**day** 6:18,
20 9:22
10:24
16:12
18:11,15
20:1,2
24:10,13
25:11
26:7,8,15

**days** 15:2
18:3

**debt** 9:5,6

**December**
15:14

**decided**
5:13

**default**
13:6

**degree**
4:17 5:15

**deliver**
22:10

**department**
5:4

**deposit**
11:9
18:20,21,
22,23
19:4,9
22:18
23:25
25:1,2,6,
9,11,21
26:1,3,5,
17 27:2,4

**deposited**
15:24
16:4,10,



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 36 of 42

LESLIE NICHOLS                                      August 15, 2013
U.S.A. vs. U.S. FUNDS                         Index: depositing..form

11 26:25

**depositing**
9:14
15:23
18:7

**deposition**
3:2 22:4
28:20

**deposits**
6:19 9:20
13:19,20
15:4 18:6
19:11,21,
22 23:15
24:21,22,
24,25
25:3,8
27:9
28:11

**describe**
8:11 10:1

**details**
18:16

**didn't**
3:23,25
8:18
12:24
13:10
20:8

**dig**  11:10

**directly**
7:15,17

**directors**
9:13

**Discover**
10:22

**discovered**
5:15 11:8

**discovery**
21:9

**discrepanci es**  11:4,7,
8,11
18:18

**discrepancy**
18:19

**discuss**
22:9

**discussed**
13:19

**discussion**
8:8

**document**
20:17

**doesn't**
23:23

**don't**
3:22,24
14:6,12
17:13
20:11
22:8 23:1
24:7,12
27:25

**drive**
22:17

**duly**  3:12

**duties**
6:13,23
7:6,12

**duty**  23:4

―――――――――――
**E**
―――――――――――

**E-r-w-i-n**
23:10

**earlier**
3:5 18:9
20:3

**easy**  8:13

**Eddie**
12:22,25

**educational**
4:12

**elected**
15:8

**employed**
5:16 27:7

**employee**
6:11
23:2,6

**employment**
5:1,7
7:20 9:9
14:24
16:21
19:8 23:4
24:11

**end**  10:24
15:13
18:5,10,
15

**ended**
14:24

**enforcement**
10:10,13

**entity**
17:8

**entry**
27:13

**Erwin**
23:7,10

**evaluation**
8:15

**evening**
11:9

**events**
15:5,20

**exact**  26:6

**EXAMINATION**
3:13

**excess**
27:9

**exhibit**
21:18
22:1,3,4,
5 24:14

**expected**
15:18

**explain**
13:7

**extent**
19:19

―――――――――――
**F**
―――――――――――

**facility**
5:11 9:6

**fair**  8:13,
23 26:1

**fairly**
6:19

**familiar**
11:12,14

**family**
4:21

**Fargo**
16:6,10,
15,21,22
17:3,6

**father**
5:18

**February**
15:3

**federal**
3:6
13:16,24
14:5
15:23

16:4,5,
15,20
18:7 20:5

**felt**  8:6,
17 13:13
15:9

**filed**  3:20
19:10,12

**financial**
6:15
12:4,5,6
13:4,12
18:21
21:24

**financially**
10:18

**find**  11:4,
7,11
21:19

**fine**  3:7
8:13 24:7

**finished**
4:14,17

**fire**  10:14

**firm**  5:24
6:1,4

**floor**  6:19
9:18,19,
23 10:20,
25 18:9,
10,16

**flow**  11:17

**force**
21:24

**Forest**
5:10

**forgot**
23:21

**form**  10:23



LESLIE NICHOLS
U.S.A. vs. U.S. FUNDS

forward
8:9

freedom
12:8

frequency
19:24

frequent
19:4

front
23:13

full   6:11

fully
17:16

future
15:10

_____

G
_____

G-o-b-e-r
21:25

Garrett
17:14

gave   7:19
9:11 21:8

general
22:23,24

generally
8:11

Georgia
4:10,11,
15,16,21,
24

give   21:18

Gober
21:25

good   8:16

government
3:8 20:20

Grant
20:14

granted
9:9

greater
26:1,2,6

GREENWOOD
20:16
21:14,21
23:19

grew   7:7

guess   7:9,
12 9:3

gun   9:16
15:5,10

guns   15:9,
11

_____

H
_____

half   7:1,7
12:25

hand   15:20
26:26
27:1,10,
14

handle
6:20

handled
6:15 9:22
13:9

hands   13:9

happened
15:11,12,
14

hassle
19:14

hear   3:25

heard   4:7

11:21
14:7

heavier
7:9

heavily
7:25

here's
21:8

hesitate
26:23

he's   5:19
6:2 8:13,
22

high   4:13,
14,15

hired
14:24

history
5:1

hold   18:25
19:3,5,7,
9 20:1

honest
8:23

Hook   15:14

house
28:16

Houston
4:14,20,
22

_____

I
_____

idea   19:11

improved
8:17

inappropria
te   13:14

incident
15:14

increase
15:5

increased
7:7

incurred
9:6

Indonesia
5:8

information
12:8,17
27:19

instance
15:2

instances
15:2

instruction
23:5

insurance
7:10,11

integrity
8:21,22

interaction
12:24,25

International   5:5

involved
9:1,13
13:8

involvement
12:20
13:12

IRS   19:11,
14

it's   3:3
5:23
11:25
18:15
21:9,10,

23 22:1
25:5 26:4
27:2,8

I'd   18:13

I'll   3:24
4:1

I'm   3:18
4:6 6:5
7:4
11:15,21,
22 14:11,
19 18:22
20:11,14
26:25
27:2

I've   9:9
11:21
14:14
15:17
21:2 24:3

_____

J
_____

Jamison
5:16
16:22
17:13

Jane   3:17

January
5:20 7:3,
4 14:18
24:9,11

job   5:14,
15 6:3
7:19,21
8:4

Johnnie
17:19

June   7:2



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 38 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                        Index: kind..November

**K**

kind   13:9
   15:10
   22:13
   28:8

knew   8:18
   13:5

knowledge
   3:22
   14:12
   17:10,12
   19:20
   23:24

**L**

late   5:19
   19:6

Law   14:5

learn   14:9

learned
   14:15

left   5:20
   13:9
   14:18
   17:19
   23:3
   24:13,15

legislation
   15:15

legitimate
   27:17

Leslie
   3:3,10,17

let's   4:9
   6:8  9:14
   15:4
   26:10

level
   26:12

Liberty
   4:18

likewise
   3:24

list   23:23

listed
   21:17,23

live   4:10

lived   4:23
   5:9

living
   5:11

located
   5:7

location
   13:1

lock   11:12

log   12:9
   17:2,6

lot   6:15
   8:17
   14:15

**M**

made   9:6,
   11  10:19
   12:11
   13:20
   19:8
   24:25
   25:1,
   26:3
   28:10

main   5:4
   6:21
   16:8,12

majority
   25:8

make   6:19
   10:17
   11:2,3,6
   19:1
   24:5,24
   25:2

making   8:6
   19:22
   27:10

man   8:22

manager
   6:15
   10:25
   18:10

manipulated
   11:18

March   15:3
   23:17

mark   24:8

marked
   22:3

Mastercard
   10:22

Master's
   4:17

matched
   11:3,6
   18:18

matches
   18:14

matter
   3:22

Mccauley
   14:20,21
   17:19

meaning
   10:10
   11:1  17:4

means
   17:25

meant   14:2

medical
   4:3

meeting
   20:5

mentioned
   18:9

met   13:16

Michael
   3:18
   21:8,23
   24:6

Mission
   5:5

mission's
   5:6

modificatio
ns   10:9,
   12,17

modified
   11:18

modify
   12:3

money
   16:14
   17:4,7
   18:11,13,
   22  19:25
   22:15,18

monitor
   7:25

monitored
   7:20

monitoring
   12:12

month   18:5

monthly

9:6

morning
   9:21  11:9
   12:3
   18:12

Morose
   21:25

mortgage
   9:7

move   8:9
   16:16

moved   4:21
   5:10

**N**

natural
   7:12

nature
   12:18
   19:16

needed
   7:22,23
   13:2

negative
   23:22

neighborhoo
d   6:25

Nichols
   3:3,4,10,
   15,17
   5:21
   14:24

North
   5:10,12

notice   3:3

November
   5:18
   15:7,12,
   13  19:6



Case 3:13-cv-00062-CDL   Document 30   Filed 08/22/13   Page 39 of 42

LESLIE NICHOLS                                    August 15, 2013
U.S.A. vs. U.S. FUNDS                             Index: number..purchased

number
  10:10,11,
  13 19:1
  21:18
  25:5,12,
  17,19,20
  26:10

numbers
  10:14,17
  24:15

——————————

O

——————————

Oakridge
  5:11

Obama  15:7

observe
  13:13

occurred
  21:3

occurrence
  19:5

office  5:4
  6:21
  18:12

officer
  23:7

online
  17:1

open  8:7,8

opening
  5:15

operating
  16:6,9,15

operations
  16:12

opinion
  7:18 8:2,
  20 9:16

order
  21:20

organizatio
n  9:4,12

organizatio
ns  9:3

original
  21:12

——————————

P

——————————

P-12  21:23

p.m.  25:6

P232  28:9

paid  9:8,
  10 28:4

paper
  20:25

part  5:4
  9:21
  10:12
  12:14,16
  21:5 22:4

partner
  6:2

passed
  15:15

Patat
  12:22

pay  9:7,11
  28:2

payment
  9:11
  10:21,23

payments
  9:7

people
  15:8

Perfect
  24:4

perform
  7:19

performance
  8:15

period
  6:23 15:6

periodicall
y  16:14
  17:25

permit
  22:7
  28:2,6

Perry
  4:10,11
  5:22

person
  16:20

personal
  13:10
  28:13

PETERMAN
  23:9,11

picked
  19:5
  26:24

place
  22:12,14

Plaintiff's
  22:1

planning
  21:5

point  9:24
  10:1,5,7,
  8,17
  11:2,7,
  13,16
  12:2,5,13
  17:22

18:14
  24:13
  26:15

police
  23:7

Poor  21:5

position
  17:16,20

pre-trial
  21:20
  22:5

preferred
  19:9

Pregnancy
  9:2

prepare
  18:20

preparing
  6:17

Pretty
  19:18

prevent
  4:3

previously
  17:15

primarily
  19:22

principal
  6:1

principle
  9:8

print  17:5

prior
  13:16
  14:1 20:5
  26:15

problem
  21:7

problems
  8:19

procedure
  12:21
  13:13
  18:7

procedures
  9:14
  15:22

process
  11:10

profit
  9:2,4,9

program
  10:3,5
  11:13,19,
  20,22
  12:14

programs
  12:5

progression
  7:12

properly
  27:20,22

property
  7:11

provide
  13:5

provided
  20:18,21
  24:3

providing
  4:4 12:17

public
  5:19

pull  26:9

purchase
  15:8,11

purchased
  9:5



LESLIE NICHOLS
U.S.A. vs. U.S. FUNDS

August 15, 2013
Index: purchases..Saturday

purchases
  15:10

purposes
  16:9

purse
  22:16

pursuant
  3:3, 28:5

pursue
  5:14

put  18:11
  22:16

_____

          Q

_____

question
  3:23,24,
  25 4:1,6,
  7

questions
  3:19 13:4
  27:25
  28:18

quick  10:7
  11:17
  12:1,14
  13:3
  18:21
  24:1

quotes
  7:10

_____

          R

_____

raised
  4:20

Raleigh
  5:12

range  19:3
  25:9,21

rarely
  25:2

re-  15:7

real  24:1

reason  4:3
  27:16,19

reasons
  8:10 9:3

recall
  22:22
  23:1
  24:12

receipts
  16:11

receive
  14:13

received
  9:21
  18:23

recent
  21:10,16

recollectio
n  24:24

recommendat
ions  8:3

reconcile
  9:19 18:4

reconciliat
ions  6:17

reconciling
  6:18

record
  3:16
  27:24

recount
  18:13

refer
  21:15

regard
  7:18

register
  11:1

registers
  6:18
  18:17

regular
  6:19 9:17

reimbursed
  28:3

related
  13:6

relationshi
p  8:17

remaining
  19:4

removed
  17:18

rendering
  21:16

repeat
  3:24

rephrase
  4:1

report
  7:15
  11:2,6
  12:10,11
  18:14,15
  19:10,16,
  17,18
  26:15

reported
  7:17

reporting
  12:6
  14:8,9
  20:4,8

reports

19:12

represent
  3:21

required
  14:13
  20:4

requirement
s  14:4,8
  20:4,9

research
  14:14

reservation
s  3:5

residence
  28:13

residing
  4:9

responsibil
ities  6:4,
  14 7:8

responsibil
ity  9:22
  12:14,16

responsible
  7:10
  12:12
  19:22

restrict
  15:9,15

returns
  6:6 12:18
  13:10

revenue
  27:17,18

review
  18:1,2

ring  10:20

Robins
  4:15
  5:19,23,

13:24
  15:23
  16:3,5,
  14,19
  18:7

Ronnie
  23:7

roof  15:17

roughly
  14:23

routine
  7:22

Rules  3:6

run  11:2
  12:11

running
  24:15

_____

          S

_____

sale  10:7,
  8,17,19,
  24 11:2,
  13,17
  12:2,5
  18:14
  26:15

sales
  9:19,24
  10:1,5,
  19,20,25
  11:7
  12:13
  15:5,13,
  16 18:9,
  10,16

Sandy
  15:14

Saturday
  25:2,3



savings
16:3,5
17:7

school
4:13,14,
15

Sean  21:25

Section
14:5

security
22:9,21,
23

semesters
5:13

seminary
5:12,13

serial
10:10,11,
13,14,16

services
6:6,16

set  7:23
13:2
26:13

shared
19:20

Sheila
17:14

She's
21:14
23:21

sick  25:4

side  13:11
24:16

Sig  28:9

sign
16:19,21

signer
16:22

signing
16:18

sir  5:25
6:2,10
7:14
20:19
25:7,16,
18 26:19,
21 27:5

software
10:12,18
12:4,7,9
13:4
18:21,22

sold  10:14
15:16

sort  6:22
7:11,24
17:2 23:3

specific
22:22
23:4

specificall
y  9:1
19:15
23:1
24:13

specificati
ons  14:6

spelled
21:25

spike
15:20

staff  6:5

start  4:9
6:11

started
6:9,14
10:4
17:14

starting

20:18

state  3:15

statements
17:6 18:4

states  5:8

step  10:3,
4 27:23

STIPULATION
S  3:1

stocking
6:21

store  9:16
10:15
13:1
18:11

Street
4:11

structured
20:21

structuring
14:2

struggling
14:19

subpoena
3:4

suggest
27:20

suggestions
8:3,6,7

supplies
6:21

switched
10:6

sworn  3:12

sync  12:6

system
9:20,24
10:2,6,7,

8,21
11:3,5,
13,17,25
17:2
18:15
27:21

_____

T

table
21:10,11

taking
17:20
22:12
23:21

talk  9:14
19:15

talking
10:14

task  21:24

tasks  7:23

tax  6:6
12:18
13:10
27:21

taxes
12:23
27:22

telling
18:22

ten  25:17

tender
10:20,24

term  14:1
19:17,18

terminology
11:21

testified
3:12 20:3

testimony
4:4

Thanksgivin
g  15:12

that's
3:7,20
5:22,24
10:5
12:11
15:12
16:1
20:15
21:9
23:13
24:7
25:10,20,
22 26:2,5
28:17

there's
12:7,9
26:5

They'd
11:4

thing  6:22
7:12,24
17:2 23:3
25:25

things
12:7,18
13:7,11
17:1 21:4

time  5:4
6:11 7:9
14:14
15:6,12
16:21
26:24
27:7

times  18:2

title  6:15

today  4:4



LESLIE NICHOLS
U.S.A. vs. U.S. FUNDS

August 15, 2013
Index: town..you've

town   25:1,
4

track
10:11,16

tracked
11:25

trail   12:9

training
15:1,3

transaction
10:21
12:11

transaction
s   13:3

transfer
16:14
17:4,7,8

transitione
d   17:16

trial
21:16

truthful
4:4

turn   24:14

Twenty
21:4

type   22:13

types
15:16

typically
16:8
19:3,25
22:16
27:12

_____

U

_____

uh-huh   7:5
23:14,18,

22 24:19

uh-uh
23:22

uncover
18:19

understand
3:23 4:1
11:15

understandi
ng   19:16

understood
4:7

Union
15:24
16:4,5,
15,20
18:8

unique
10:9

University
4:16,18,
24

unusual
15:18

update
12:4

USADEB
20:18

USC   14:5

user   17:2,
6

_____

V

_____

vault
18:12,13

vendors
16:13

verbatim

23:22

verify
18:14,17

version
21:10

view   17:3,
5

viewing
17:11,13,
14,15,17,
19,21,22,
24

Visa   10:22

visual
16:18,25

_____

W

_____

wait   20:1
21:19

Wake   5:10

wanted
15:10

Warner
4:15
5:19,23,
24

Washington
4:11

wasn't
8:14 19:4

weapon
22:7
28:5,8,10

weapons
15:16

Wednesday
24:11

week   14:23

18:2

Wells
16:6,10,
15,21,22
17:3,6

weren't
11:8

we're   3:4
23:22

we've
21:17,18,
23

what's
14:12

work   5:5,
17,20 6:5
7:25
8:13,14,
24 9:17,
19 12:17
14:25
18:12
23:23
28:15

worked
5:3,6,11
6:24
10:2,18
14:21,23
15:6

Workers'
7:10

working
5:18 7:8
8:16,18
14:12
19:21

worksheet
21:24

wouldn't
8:7

Writing
6:17

_____

Y

_____

year   4:19
5:8, 7:20
8:1,5,14,
15 12:23,
25

years   4:22
5:7 6:25
7:1,8

you'll
24:14,15,
18

you're
10:13

you've
25:19

