IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

ATHENS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) CIVIL ACTION NO. | |
| CURRENCY $940,313.00, ) 3:13-CV-00062-CDL | |
| ) | |
| Defendant, ) JULY 22, 2013 | |
| ) | |
| and ) MOTION HEARING | |
| ) | |
| CLYDE ARMORY, INC., and ANDREW ) | |
| W. CLYDE, ) | |
| ) | |
| Claimants. ) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND,

UNITED STATES DISTRICT JUDGE

Proceedings recorded by mechanical stenography; transcript produced by computer.

BETSY J. PETERSON, RPR, CCR
Federal Official Court Reporter
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

```
 1                          APPEARANCES

 2


 3   FOR THE PLAINTIFF:

 4        DANIAL E. BENNETT
          danial.bennett@usdoj.gov
 5        Assistant U.S. Attorney
          Gateway Plaza
 6        300 Mulberry Street
          4th Floor
 7        Macon, Georgia  31201
          (478) 752-3511
 8

 9

10   FOR THE DEFENDANT:

11        MICHAEL C. DANIEL
          mdaniel@pdwlawfirm.com
12        Prior, Daniel & Wiltshire, LLC
          490 North Milledge Avenue
13        Athens, Georgia  30601
          (706) 543-0002
14

15

16

17

18

19

20

21

22   COURT REPORTER:

23        BETSY J. PETERSON, RPR, CCR
          Federal Official Court Reporter
24        P. O. Box 81
          Columbus, GA 31902
25        (706) 317-3111
```

```
 1        (Proceedings on July 22, 2013, commencing at 6:26 p.m., as
 2    follows:)
 3            THE COURT:  This will be in the case of United States
 4  of America versus $940,313, Case 3:13-CV-62.  The defendant --
 5  or not the defendant -- I guess, the principal, that is the
 6  claimant, Clyde Armory, Inc., and Mr. Andrew Clyde.
 7            That would be you, sir?
 8            THE CLAIMANT:  Yes, sir.
 9            THE COURT:  And you are represented by Mr. Michael
10  Daniel?
11            THE CLAIMANT:  Yes, sir.
12            THE COURT:  The government is represented by
13  Assistant U.S. Attorney Mr. Danial Bennett.
14            MR. BENNETT:  Yes, sir.
15            THE COURT:  I have read the file and the motions.
16  And the defendant has presently got pending a motion for
17  release of part of the funds that were seized, claiming that
18  the retention of the entire amount would amount to an
19  unconstitutional deprivation.
20            And my concern is this, Mr. Bennett.  If there is no
21  evidence that this amount of money, $940,000 and three --
22  $940,313 was involved in illegal activity such as money
23  laundering or proceeds of illegal activity or some type of tax
24  evasion, if the contention here is simply that those deposits
25  were not reported, which is a violation of the law, it seems
```

1  clear to me that the seizure, while it may have been
2  statutorily authorized and permitted, that if the forfeiture is
3  finalized in that amount, it would be so excessive that I think
4  there are constitutional concerns.  And so the dilemma seems to
5  be if the statute does not expressly provide a remedy
6  preliminarily, then the claimant is in the posture of being
7  deprived of at least a substantial portion of his cash assets
8  that it's reasonable to assume the government is not ultimately
9  going to end up with anyway.  But he's deprived of that until
10 he can get a final forfeiture trial.  And I'm trying to figure
11 out why depriving him of those proceeds, even if it is just
12 until he's able to get his final trial, is nonetheless not a
13 constitutional violation.  I mean, do you think that it's going
14 to be reasonable under any scenario for the government to be
15 able to retain $940,000 from this claimant simply because he
16 didn't report that he was making these cash deposits in the
17 manner that he was making them, Mr. Bennett?
18          MR. BENNETT:  Yes, Your Honor, could I answer with a
19 little bit of background to your question?
20          THE COURT:  You can.
21          MR. BENNETT:  What began this case was 109 separate
22 instances of structuring more than $940,313 in the span of 10
23 months.  The structuring activity increased from beginning in
24 May of 2012 rolling around until March 2013.  In January and
25 February and March of 2013, these were daily deposits in the

1  amount of --
2           THE COURT: I understand all that. And I understand
3  the background and how this happened and it appears that he
4  should -- or I don't know he should. I understand how the
5  government came to conclude that he was structuring these
6  transactions to avoid the reporting requirements. Let's just
7  assume today that that's a given.
8           Has the government learned of any new information to
9  suggest that this structuring was done in a way to evade any
10 law other than the reporting law?
11          MR. BENNETT: No, Your Honor. The government has not
12 undertaken discovery in this case. As I sit here before you, I
13 have no information that would suggest that Mr. Clyde's banking
14 activity was anything -- and I'm trying to be careful because
15 most of the discussions I have had and most of what I know
16 about this case is from settlement discussions that have
17 happened between the parties, and I'm trying to be very careful
18 not to say something to the Court that was covered in the ambit
19 of a settlement discussion. But I think it's fair to say, no,
20 I don't have any information that would substantiate a
21 suggestion that this was -- that these are proceeds of money
22 laundering and that these are proceeds of illegal gun running.
23 This isn't anything more than any legal decision on how to
24 handle otherwise legitimate proceeds.
25          What I would like to quickly point out to the Court,

1  though, is that even though this doesn't involve money
2  laundering or another financial crime, it's important that the
3  calculation under the advisory guidelines, just a quick
4  calculation, if we had prosecuted just on the information that
5  we have, the advisory guideline range for this amount of money
6  is 41 to 51 months and the fine is $500,000.  That's the
7  maximum statutory fine.  So it's not an insignificant
8  noncriminal activity in and of itself.
9        That said, Your Honor, it would be our argument that
10 even though we have seized the full amount, we have the
11 circumstance to seize the full amount of the money that was
12 involved in the structuring at 940,313, which frankly never
13 happens.  But that was the amount that was -- at least in this
14 district it's not happened -- that's the amount that was
15 seized.  That -- it may well prove that it's not, per se,
16 invalid that we couldn't have made an argument for more than
17 $500,000.  That said, to answer your question more directly,
18 no, we don't have any more information.  Now, once discovery --
19       THE COURT:  Right.  Let me ask you this.  Is it your
20 position that there is no remedy available that the Court can
21 provide that would require the government to release part of
22 the seized proceeds?  Is that your position, that there's just
23 no remedy under the statute to do that?
24       MR. BENNETT:  Respectfully, Your Honor, the statute,
25 the exclusive remedy of pretrial release of seized assets is

1   found at 18 U.S.C. 983(f).  As I briefed, 983(f) has A through
2   E, five conditions.  E is -- relates to another subsection
3   where if the currency is seized from a legitimate business but
4   it's currency that's seized, not the business itself -- again,
5   I don't want to repeat what's already been briefed -- then if
6   983 fails, then, no, the district court does not have authority
7   to order the release of those funds because you don't get into
8   the hardship provision.  You don't get into the merits of the
9   balancing of what's fair and what's not fair, simply because in
10  passing 983(f) and in writing it the way it did, Congress
11  realized that currency can dissipate if it's returned pretrial.
12          THE COURT:  So is it the position of the government
13  that it does not have the discretion to enter into some type of
14  agreement to release part of the funds pending trial?
15          MR. BENNETT:  To the contrary, Your Honor, it's the
16  position, the government certainly can and will continue to
17  negotiate in good faith to attempt to find --
18          THE COURT:  This is what I'm inclined to do.  If I
19  were to conclude that I do not have the authority to reduce the
20  amount that is seized pending the trial, then what I'm inclined
21  to do is provide the defendant, or the claimant, with an
22  expedited trial so that he can go ahead and have his trial on
23  the merits and we'll let a jury see whether they think the
24  government ought to keep $900,000.  And I'm prepared to do that
25  while I'm here in Athens for the next two weeks, depending upon

1  how my other trial proceeds.
2          We're starting a trial tomorrow that is scheduled to
3  last into next week.  It could last all the way through Friday,
4  but it may not.  And what I'm inclined to do is tentatively set
5  this case down for a final trial next Thursday.  And if that
6  case gets done by Thursday -- I can't imagine this case would
7  take more than a couple of days to try -- then we'll go ahead
8  and have a final trial.
9          If the government doesn't want to proceed in that
10 manner, then they can agree to voluntarily release a reasonable
11 amount of proceeds.  I mean, I have not prejudged the case
12 fully on the merits, but I'm fairly well convinced that
13 $940,000 is excessive.
14         Now, given that, what's the likelihood that some
15 agreement could be reached in the interim to reduce the amount
16 seized?
17         Do you have any idea, Mr. Bennett?
18         MR. BENNETT:  Your Honor, I will say -- and
19 Mr. Daniel can certainly correct me -- we have engaged in
20 discussions, really, since I got the case.  That's the way I
21 operate.  I have tried very hard to at least work something
22 out.  Of course, I have -- you know, Mr. Daniel has a client --
23 I have a client as well.  I think there's at least been good
24 faith effort to try and resolve it.  We're not there yet, but
25 certainly with the Court's guidance and the Court's

```
 1   commentary --
 2            THE COURT:  What's your position, Mr. Daniel, as to
 3   whether or not the Court, short of having a final trial on the
 4   merits, whether the Court has the jurisdiction or the authority
 5   to order a reduction in the amount seized?  I mean, you clearly
 6   don't want to just have the Court do something and then that
 7   order get appealed and the funds be unavailable during that
 8   appeal, unless there is very solid ground that the Court's
 9   order is authorized.
10            So what is your opinion or argument with regard to
11   where is the basis of the Court's authority to reduce the
12   amount seized?
13            MR. DANIEL:  May I address the court?
14            THE COURT:  Yes, sir.
15            MR. DANIEL:  Judge, this -- based on my research of
16   this matter, which is kind of unchartered water as far as the
17   release of money, I believe that there are logical arguments
18   and sound arguments for releasing the money based on the
19   proportionality issue.  The issue that the Court must
20   circumvent is the timeliness issue which the government has
21   raised.  There's at least one court -- it's a district court --
22   has actually disallowed the earlier release based on
23   timeliness, but it did make a comment that the Court could in
24   certain circumstances base a decision on the pleadings, a 12(b)
25   (6)-type analysis.  And I think that's what the Court is doing
```

1    here today.
2           The Court has also represented to the government --
3    assuming, you know, that he's guilty, that Mr. Clyde is
4    guilty -- assuming that, then the amount that they have taken
5    is excessive.  So I think the Court has already engaged in that
6    12(b)(6) analysis here.  I cannot tell the Court with certainty
7    that there's case law.
8           THE COURT:  Would you be ready to go to trial on the
9    merits next Thursday?
10          MR. DANIEL:  Absolutely, Your Honor.  That would be
11   the cleanest way.
12          THE COURT:  How long do you think the trial would
13   last?
14          MR. DANIEL:  Two days.
15          THE COURT:  All right.  Mr. Bennett, how long do you
16   think a jury trial would last?
17          MR. BENNETT:  Two days, Your Honor.  But I would like
18   you to ask me if I could be ready on that schedule.
19          THE COURT:  What's your answer?
20          MR. BENNETT:  I'm set to be in front of Judge
21   Treadwell for a civil forfeiture case on Wednesday, July 31st.
22   I know the Court indicated that it would have this ready for
23   jury trial starting on that Thursday.  That sandwiches me
24   between a criminal docket that I am not yet off for Judge Royal
25   starting August 5th, I believe, here in Athens as well.  So --

1        THE COURT:  Well, that would be perfect timing for
2   you.  You just get to stay up here.  I don't know we're going
3   to reach it, quite frankly.  I mean, it will depend on whether
4   this other case goes to the jury by next Wednesday.  I think
5   that's going to happen, but I can't say for sure.  I mean, to
6   me if there was ever a case that required priority, as far as
7   it being decided on the merits, it's this one.  And the
8   government has a option, and that is to reach some amicable
9   agreement as to the amount that it's willing to release
10  preliminarily.
11           As I understand it, the defendant has -- I mean, what
12  I would be inclined to do is -- if I had the authority to do
13  it, which I have not yet decided -- I would be inclined to try
14  to determine how much of that cash the defendant needs as
15  working capital for the next so many days until we get to a
16  trial on the merits.  And if that amount still leaves a
17  sufficient amount in forfeiture that is likely to cover any
18  final forfeiture verdict, that would seem to me to be a
19  reasonable resolution of it in the short run.
20           I just can't imagine -- I mean, you may -- with your
21  talent, Mr. Bennett, you may surprise the Court, but based on
22  the present record -- which is not necessarily what the trial
23  record would be -- it would be shocking for a jury to say under
24  these circumstances the government ought to get $940,000 of
25  this man's cash.  I just -- maybe there's something else that I

1  don't know and something else that a jury is going to know, but
2  if there's no indication that -- and I'm not trying to minimize
3  the crime of structuring or failure to report.  But as I
4  understand it, the whole purpose behind that statute, in
5  addition to it being a crime in and of itself, is to detect
6  people who are using that to commit other crimes, whether it be
7  money laundering or tax evasion or something else.  And if
8  there's no evidence of that, $940,000 is pretty harsh.  That
9  would far exceed, in my view, what the criminal statute
10 provides.
11         So I'm going to set it down for trial here in Athens
12 9:00 a.m. next Thursday.  We have got jurors that have already
13 been summonsed, so we will tell them to report at that time.
14 If there's some resolution of it in the meantime, then notify
15 the Court.  If the government wants to make a reasonable offer
16 about what it's willing to relinquish, even if Mr. Daniel is
17 unwilling to accept it, that would influence the Court's
18 decision as to whether to continue the trial, because I would
19 only be placing the trial down in an expedited manner because
20 of the, what I consider to be, the potential for this undue and
21 extreme hardship.
22         So if you decided, okay, we'll relinquish $400,000,
23 and he says, no, I have now got my trial date, we'll just take
24 our trial date, if you inform the Court of that and you are not
25 ready for trial, I think I may would be inclined to continue

```
 1  the trial, I guess is what I'm suggesting to you.
 2          But other than that -- to me, that's the only -- at
 3  least looking at it superficially, if the statute doesn't
 4  provide a remedy, then that's the best remedy I think the Court
 5  can provide under all the circumstances.  I assume that's what
 6  Congress would say.  If they intended not to provide a remedy
 7  in the interim, I'm assuming some of those congressmen would
 8  say, well, the judge can just set down a final trial in an
 9  expedited fashion and get it handled.
10          That's what we'll do.  Now, if it doesn't -- if we
11  don't reach it Thursday, then we could try it in Columbus, I
12  think, the last week in August.
13          Who are these witnesses going to be other than
14  Mr. Clyde from the defendant's -- the claimant's standpoint?
15          MR. DANIEL:  Judge, we --
16          THE COURT:  Are they people that if you needed to
17  bring them to Columbus --
18          MR. DANIEL:  Absolutely, Judge.
19          THE COURT:  Who do you have?  You got law
20  enforcement?
21          MR. BENNETT:  Law enforcement, Your Honor.  And then
22  maybe a few others.  I think the time that the Court said,
23  maybe two days, is reasonable.  And I'm mindful what the Court
24  said, and I certainly will report back to my supervisors what
25  you have communicated on.  I would ask that -- I guess my only
```

```
 1  concern is that the government would be deprived of any
 2  opportunities to do discovery.
 3           THE COURT:  No, I'm going let you do that discovery
 4  between now and Thursday.  Do you have people you want to
 5  depose?
 6           MR. BENNETT:  Your Honor, I think it would probably
 7  be better, in light of the Court's comments, to just go ahead
 8  and --
 9           THE COURT:  Evaluate that tomorrow?
10           MR. BENNETT:  Yes, Your Honor.  I think that's right.
11           THE COURT:  I'm going to expect you, Mr. Daniel, if
12  you want to go to trial Thursday week, then you need to make
13  available to Mr. Bennett anybody that he wants to depose
14  sometime this week.
15           MR. DANIEL:  Judge, we'll include the weekend.
16           THE COURT:  They need to be made available, and you
17  need to produce any documents that he requests in an expedited
18  fashion.  I'm assuming the government already got all that
19  before you filed the case.  That's how you determined that he
20  was --
21           MR. BENNETT:  There's additional complications with
22  that, Your Honor, but --
23           THE COURT:  If you have got any documents that you
24  need, you file those -- have you already filed document
25  requests, written discovery?
```

```
 1              MR. BENNETT:  Your Honor, we have taken the position
 2   that the Court is not -- Your Honor, this is -- to us this is
 3   not -- with respect, this is no different than any other civil
 4   forfeiture case.  The Court has not issued a 1626 order.
 5   There's been no --
 6              THE COURT:  This is a little different.
 7              MR. BENNETT:  There's been no discovery.  We haven't
 8   done any of those things yet.
 9              THE COURT:  All right.  Well, you issue your written
10   discovery by 5:00 p.m. tomorrow and -- what's tomorrow,
11   Tuesday? -- and, Mr. Daniel, you shall respond to that written
12   discovery within 48 hours.  And then any depositions need to be
13   concluded by a week from today.  And then you'll have a couple
14   days for trial preparation.
15              MR. BENNETT:  Proposed jury instructions, Your
16   Honor?
17              THE COURT:  Have those to me by Wednesday week at
18   5:00.  Just before we get started on Monday -- I mean on
19   Thursday.
20              MR. BENNETT:  Yes, Your Honor.
21              THE COURT:  If we don't reach it on Thursday week --
22         (A discussion was held off the record.)
23              THE COURT:  If we don't reach it this Thursday, we
24   will try the case August 26th in Columbus.
25              MR. DANIEL:  Judge --
```

BETSY J. PETERSON, RPR, CCR
Federal Official Court Reporter
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

1          THE COURT:  Now, if the parties between now and, say,
2     this Friday would prefer to just try it then in Columbus as
3     opposed to next Thursday, then I'm amenable to that.  I mean,
4     that's still very expedited.  But that may be preferable to
5     both sides.
6          MR. BENNETT:  I'll put on the record, Your Honor, it
7     would be our request that -- I would like to do it right and I
8     would like to do it as quickly as we can.  But I would also
9     like to do it right, not do it sloppy.  And August 26 is, from
10    the government's perspective, not with just this case but the
11    other cases that are out there, that would be certainly
12    preferable to us, with due respect.
13         MR. DANIEL:  Judge, we --
14         THE COURT:  Mr. Daniel, what's the situation as far
15    as -- I mean, is this -- what's the impact on the business as
16    far as working capital and that type situation or on him
17    personally?
18         MR. DANIEL:  Judge, we have a need for working
19    capital at this time of the year of $600,000.  And the reason
20    for that is, in the firearms industry the big selling point is
21    the fall.  The point of the season, the inventory for the fall
22    season has to be purchased in the summer.  If you don't
23    purchase that inventory in the summer, it's gone.  As the Court
24    may be aware, there's a shortage in firearms and shortage in
25    ammo.  And if you don't get that inventory in your store in a

1 timely manner, you miss an entire season.

2 There are other reasons that we need that money. But
3 we certainly would be reasonable with the government in
4 negotiating the figure. But we really would --

5 THE COURT: What amount -- can you say today what
6 amount would be minimally acceptable to have up until August
7 26?

8 MR. DANIEL: Judge, the 600 includes an upgraded
9 point of sales service in the store. They had hired an
10 employee to put that system in, and he's just sitting there
11 right now. But that's only $100,000. We could push that off,
12 but it would take minimally $500,000 to put us in a position
13 where we can function appropriately in the inventory realm of
14 the business.

15 THE COURT: Okay. What is the explanation for having
16 done deposits this way?

17 MR. DANIEL: We were attempting -- we did not realize
18 that it was illegal, number one. We were ignorant of the law.
19 We were attempting to avoid audit exposure. He had been told
20 in the firearms community that you don't make deposits over
21 $10,000. And several people had advised him of that. He was
22 not aware of the requirement, for the lawful legal requirement
23 for reporting funds. He just made a mistake. No intention.
24 We think that, you know, the standard under the law in the
25 Eleventh Circuit is you have to have the intent to cause a

1  financial institution not to report.  He certainly did not have
2  that intent.  He was just ignorant.
3          I might add, I think the Court has read the
4  pleadings, but Andrew Clyde is a decorated military person that
5  is just a salt of this community, just a pillar of this
6  community.  I mean, it's -- this is just a sad situation,
7  Judge.
8          THE COURT:  All right.  We're going to go to trial
9  Thursday week assuming this present case gets to the jury by
10 then -- I am confident it will -- unless there's some
11 resolution of the matter before then that's not necessarily a
12 final resolution but a resolution that resolves the amount in
13 the interim.
14         I might have handled several of these with you,
15 Mr. Bennett, and this is not a typical type.  And if there were
16 some statutory remedy for him in the interim to at least be
17 able to file a motion with the Court for the Court to make a
18 preliminary evaluation as to whether any of it ought to be
19 given up in the interim, then that would probably obviate the
20 need for an expedited trial on the merits.  But if his only
21 option is to have a trial on the merits, and if there's a
22 reasonable likelihood that the amount seized could be found
23 excessive, then the way I look at it is Congress has put us in
24 this situation and we got to figure out the best way to work in
25 this situation.  I think cleanest way is to have a trial on the

```
 1   merits.  So that's what we are going to do.
 2            MR. DANIEL:  Thank you, Judge.
 3            THE COURT:  We will -- you can keep informed with the
 4   clerk, check with the clerk on Friday of this week and see how
 5   our trial is going, but probably not going to know for sure
 6   until the first of next week.  But I'm going to put it down on
 7   the trial calendar for Thursday, but I will not be able to try
 8   it up here the following Monday because Mr. Bennett is already
 9   going to be here.
10            MR. BENNETT:  Yes, Your Honor.
11            THE COURT:  So we'll travel in that direction.  In
12   light of that, Mr. Daniel, do you need to make a presentation?
13            MR. DANIEL:  No, Your Honor.  I think you have
14   addressed our concerns.
15            THE COURT:  Okay.  Mr. Bennett, do you want to put
16   anything else on the record other than you object to the
17   expedited trial schedule?
18            MR. BENNETT:  No, Your Honor. I wouldn't
19   characterize it as I object to the schedule.  I just want to
20   make sure I'm clear, though.  If we're able to work out some
21   agreement on the amount that's substantial that can be returned
22   to Mr. Clyde prior to the end of this week, if we let the Court
23   know that, then --
24            THE COURT:  We'll take it off the calendar.
25            MR. BENNETT:  -- and we can get relief, the relief
```

```
 1  will put us until August.  Is that the Court's ruling?
 2          THE COURT:  Right.  The end of August.
 3          MR. BENNETT:  Thank you, Your Honor.
 4          MR. DANIEL:  May we be excused, Judge?
 5          THE COURT:  You may be excused.  If y'all reach some
 6  agreement, just file it electronically so that it will be clear
 7  on the record what the agreement is.
 8          MR. BENNETT:  Yes, Your Honor.
 9          THE COURT:  Okay.  Thank you.  We're adjourned.
10      (Proceedings concluded at 6:58 p.m.)
11                  CERTIFICATE OF REPORTER
12          I, Betsy J. Peterson, Official Court Reporter of
    the United States District Court, in and for the Middle
13  District of the State of Georgia, Columbus Division, a
    Registered Professional Reporter, do hereby CERTIFY that the
14  foregoing proceedings were reported by me in stenographic
    shorthand and were thereafter transcribed under my direction
15  into typewriting; that the foregoing is a full, complete, and
    true record of said proceedings.
16
17              This 15th day of August, 2013.
18
19
                s/Betsy J. Peterson
20              Betsy J. Peterson, RPR,CCR
                Federal Official Court Reporter
21
22
23
24
25
```